IN THE SUPREME COURT OF TENNESSEE
AT NASHVILLE
June 8, 2006 Session

**JAMES A. VAUGHN  v.  STATE OF TENNESSEE**

**Appeal by permission from the Court of Criminal Appeals**
**Criminal Court for Sumner County**
**No. CR64-1999      Hon. Jane Wheatcraft, Judge**

---

**No. M2004-00458-SC-R11-PC - Filed on September 15, 2006**

---

AND

**REARNO VAUGHN  v.  STATE OF TENNESSEE**

**Appeal by permission from the Court of Criminal Appeals**
**Criminal Court for Sumner County**
**No. CR65-1999      Hon. Jane Wheatcraft, Judge**

---

**No. M2004-00544-SC-R11-PC - Filed on September 15, 2006**

---

We granted permission to appeal these post-conviction cases and then consolidated them to determine a question common to both: were the petitioners denied effective assistance of counsel when trial counsel failed to object to an erroneous jury instruction regarding the release eligibility for a person convicted of first degree murder when there had been a recent change in the law.  Both petitioners also raise additional arguments regarding whether their trial counsel were ineffective in other respects.  The Court of Criminal Appeals upheld the decision of the post-conviction court, holding that the petitioners were not denied their right to effective assistance of counsel.  We reverse the Court of Criminal Appeals in part, holding that the petitioners were denied their right to effective assistance of counsel based on counsel's failure to object to erroneous jury instructions regarding release eligibility.  We affirm the Court of Criminal Appeals on all other issues, holding that neither trial counsel was ineffective in any other aspect of their representation.  Therefore, we reverse both petitioners' convictions for first degree murder and remand for new trials on that charge alone.  We affirm all remaining convictions.

1

**Tenn. R. App. P. 11; Judgment of the Court of Criminal Appeals is Reversed in Part, Affirmed in Part and Remanded to the Trial Court**

WILLIAM M. BARKER, C.J., delivered the opinion of the court, in which E. RILEY ANDERSON, ADOLPHO A. BIRCH, Jr., JANICE M. HOLDER, and CORNELIA A. CLARK, JJ., joined.

Cynthia Hall Templeton, Gallatin, Tennessee, for the appellant, James A. Vaughn.

Brian Dunigan, Goodlettsville, Tennessee, for the appellant, Rearno Vaughn.

Paul G. Summers, Attorney General & Reporter; Michael E. Moore, Solicitor General; David H. Findley, Assistant Attorney General, for the appellee, State of Tennessee.

## OPINION

### I. Factual and Procedural Background

*Original Criminal Trials*[1]

The petitioners, James Vaughn ("J. Vaughn") and Rearno Vaughn ("R. Vaughn"), were tried and convicted of crimes arising out of the same incident that took place in the early morning hours of July 2, 1995.[2] At that time, a group of friends had gathered outside a restaurant known as "Wing-Its," located in Gallatin, Tennessee. Parked in a gravel lot across the street was a trailer portion of a tractor trailer. Suddenly, two men came around the side of the trailer, and one said "What's up now, mother -----." Both men had guns and a flurry of gunfire ensued. The crowd scattered, with several people fleeing into the restaurant and others running down the street.

Four of those present were injured: Ardell Williams suffered five gunshot wounds to his left thigh and left ankle; Chris Williams suffered one gunshot wound to the buttocks; Tallis Bonds was shot once in the back of his right thigh and once in the foot; and Tyrone Smith was shot once in the left upper abdomen and was also shot in his left thigh. Mr. Smith died four days after the incident as a result of his wounds. With respect to Mr. Ardell Williams' injuries, testing on his clothes revealed that two of his gunshot wounds resulted from contact shots, meaning the muzzle was either touching the garment or less than three inches away.

---

[1] The two men were tried separately, but the facts from both trials are, for the most part, identical. A full recitation of the facts can be found in the Court of Criminal Appeals' decisions from the direct appeals in these cases. See State v. J. Vaughn a/k/a/ Fuzz, No. 01C01-9612-CR-00523, 1998 WL 255438 (Tenn. Crim. App. May 21, 1998), perm. app. denied (Tenn. Jan. 25, 1999); State v. R. Vaughn, No. 01-C-01-9703-CR-00086, 1998 WL 171679 (Tenn. Crim. App. April 14, 1998), perm. app. denied (Tenn. Dec. 14, 1998).

[2] R. Vaughn is the uncle of J. Vaughn.

The observations of what transpired differed among the various witnesses. Two men identified only J. Vaughn as the shooter, one identified only R. Vaughn, while two others identified both men.

After the shootings, a large scale search was conducted for both J. Vaughn and R. Vaughn. Police received information that both J. Vaughn and R. Vaughn were in Sheffield, Alabama, staying with relatives. When officers observed one of the suspects driving away from that residence, they decided to stop the vehicle and arrest the suspect. The driver of the car was R. Vaughn, who initially ran from the officers but was quickly apprehended.

Officers then obtained a warrant to search the Alabama residence for J. Vaughn. During this time, R. Vaughn was pleading with officers to allow him to talk J. Vaughn into coming out of the house. The search of the living space of the home revealed nothing. However, two handguns were discovered in the attic, which was accessible through the top of a closet. One was a Smith and Wesson .357 Magnum revolver, and the other was a Smith and Wesson .38 model 10 revolver with the serial number filed off of it. None of the occupants of the home claimed ownership of these guns. Ballistics testing revealed that the seized .357 Magnum had been used in the shootings.

J. Vaughn was finally apprehended as the result of a routine traffic stop on September 14, 1995, outside Cincinnati, Ohio.

At both trials, the juries were instructed as to the range of sentences and release eligibility for each of the indicted offenses and the lesser-included offenses. The trial court stated that if the jury found the defendant guilty of first degree murder, the trial court would impose a sentence of life in prison, which required the prisoner to serve a minimum of twenty-five years before becoming eligible for parole. However, at the time of trial, the applicable statute provided that a person convicted of first degree murder and sentenced to life in prison must serve at least fifty-one years before becoming eligible for parole. No objection was made at either trial to the erroneous jury instruction.

On May 31, 1996, the jury convicted J. Vaughn of the first degree premeditated murder of Tyrone Smith, the attempted first degree murder of Ardell Williams, the attempted second degree murder of Tallis Bonds, the attempted second degree murder of Chris Williams, and felony reckless endangerment.[3] He automatically received a life sentence for the first degree murder conviction. At a subsequent sentencing hearing, J. Vaughn received sentences of twenty-two years for the attempted first degree murder, twelve years on each count of attempted second degree murder, and two years for the reckless endangerment conviction. Those sentences were ordered to be served concurrently to one another, but consecutive to the life sentence, for an effective sentence of life plus twenty-two years. The convictions and sentences were affirmed on appeal.

---

[3]The Court of Criminal Appeals incorrectly states that J. Vaughn was convicted of attempted first degree murder of Tallis Bonds and attempted first degree murder of Chris Williams instead of attempted second degree murder for both. The trial court at the post-conviction hearing likewise made the same error.

On August 28, 1996, the jury convicted R. Vaughn of the first degree murder of Tyrone Smith, the attempted first degree murder of Ardell Williams, the attempted first degree murder of Keith Goodrich, the attempted second degree murder of Chris Williams, the attempted second degree murder of Tallis Bonds, and one count of reckless endangerment. The trial court sentenced R. Vaughn to life imprisonment for the first degree murder, thirty-five years for each count of attempted first degree murder, eighteen years for each count of attempted second degree murder, and four years for reckless endangerment. The attempted murder and reckless endangerment sentences were ordered to run concurrent with each other but consecutive to the first degree murder sentence, resulting in an effective sentence of life imprisonment plus thirty-five years. These convictions and sentences were affirmed on appeal.

*Post-Conviction Proceedings*

On February 1, 1999, J. Vaughn filed a pro se petition for post-conviction relief, which was later amended by appointed counsel. The amended petition alleged, in pertinent part, that J. Vaughn's trial counsel was ineffective by: (1) failing to object to the trial court's instruction to the jury that deliberation was an element of first degree murder; (2) failing to object to the trial court's instruction on the definition of "knowingly"; (3) failing to object to or appeal the trial court's instruction to the jury about the minimum release eligibility date for the first degree murder offense; and (4) failing to view the area of the house where the gun was found by police, failing to interview witnesses regarding this evidence, and then failing to file a motion to suppress the admission of the guns into evidence. Further, J. Vaughn asserted that his trial counsel's ineffectiveness prejudiced him.

Likewise, on February 1, 1999, R. Vaughn filed a pro se petition for post-conviction relief, which was later amended by appointed counsel. His amended petition alleged, in pertinent part, that R. Vaughn's trial counsel was ineffective by: (1) failing to object to the trial court's instruction to the jury regarding the definition of the mens rea "knowingly"; (2) failing to object to or appeal the trial court's instruction to the jury about the minimum release eligibility date for the first degree murder offense; and (3) failing to adequately prepare for trial, investigate the case, or communicate with R. Vaughn. Further, R. Vaughn asserted that his trial counsel's ineffectiveness prejudiced him.

The post-conviction court held one hearing on both J. Vaughn's and R. Vaughn's petitions for post-conviction relief.

At that hearing, attorney Walter Stubbs ("Stubbs") testified about his trial court representation of J. Vaughn against the multiple charges arising out of the July 2, 1995 shooting incident. Stubbs' theory of the case was that J. Vaughn did not commit any of these crimes, and he attempted to prove that J. Vaughn was never in Alabama where the murder weapon was found. The fact that J. Vaughn was not in Alabama, and therefore not connected to the gun, was central to his defense.

Stubbs testified that throughout preparation for the trial, J. Vaughn consistently maintained

4

that he was never in Alabama. However, Stubbs advised J. Vaughn that there were three people who would link J. Vaughn to Alabama. He asked J. Vaughn if there were any witnesses who would testify on his behalf. Specifically, Stubbs asked J. Vaughn if any of his relatives in Alabama would testify that he was not there. J. Vaughn told him that he did not want any of his Alabama relatives involved in this case and that he did not want Stubbs to contact them about testifying.

Stubbs discussed with J. Vaughn the fact that if J. Vaughn was never in Alabama, he would not have standing to file a motion to suppress the gun. Stubbs recognized that because the police were unable to link one of the two guns found in Alabama to the crimes in Tennessee, the gun could have possibly been excluded on relevancy grounds, but Stubbs did not feel that this was particularly significant considering his theory of the case.

Attorney Roger A. Sindle ("Sindle") represented R. Vaughn in the original trial. At the post-conviction hearing, he testified about his trial court representation of R. Vaughn against the multiple charges arising out of July 2, 1995, shooting incident. He discussed the case with R. Vaughn on multiple occasions, and he also discussed the case with J. Vaughn's defense attorney, Stubbs. He and Stubbs had discussed that both of their clients had instructed them not to involve their relatives in Alabama in the defense of their cases.

Sindle's defense strategy was two-pronged: first, to develop an alibi defense for R. Vaughn; and second, to attack the credibility of the State's witnesses concerning what occurred at the time of the shootings. He attempted to find R. Vaughn's alibi witnesses and tried to get R. Vaughn's mother involved to assist him in locating these witnesses. He did not contact R. Vaughn's relatives in Alabama because R. Vaughn had told him that neither he nor J. Vaughn wanted their Alabama relatives involved in the trial. There were also a number of State witnesses that Sindle did not interview. He explained that in his experience, it is adequate to review the witnesses' statements.

Sindle filed a motion to suppress the weapons found in Alabama based upon the theory that the search was illegal. However, the trial court ruled that R. Vaughn did not have standing to challenge the search as illegal: only the owners of the home would have had standing. Sindle conceded that there was a second issue with the search–that it extended beyond the scope of the warrant. However, he said that the scope of the warrant was discussed in a court hearing, and the trial court determined that the search did not extend beyond the scope of the warrant. Sindle did not go to Alabama to view the home or talk to the officer who found the weapons. He admitted that there were many details about the Alabama house that he did not know.

At the post-conviction hearing, Steven Keith Bearden ("Bearden"), an Alabama State Trooper, testified about the search of the Sheffield, Alabama, residence for J. Vaughn. During the search for J. Vaughn, Bearden searched the attic, which had an entrance through a hole in the top of a closet. When he entered the attic, he immediately saw two handguns. Bearden testified that there was not room to stand inside the attic, but there was enough room for a person to hide.

Brenda Fay Vaughn Freeman ("Freeman") testified that she had been renting the house in

5

Sheffield, Alabama, for four or five years and was living there when the search warrant was executed. R. Vaughn is her brother, and he and J. Vaughn came to visit her together. She stated that J. Vaughn was living at her house when the search warrant was executed, but he had gone to visit a friend on that specific day.

On the night of the search, J. Vaughn was at a friend's house. R. Vaughn, on the other hand, returned to the house around 5:00 p.m., at which time the police arrested him. The police then returned around 9:00 p.m. with a search warrant for the home. The search lasted approximately forty-five minutes, and according to Ms. Freeman, the house looked "[l]ike a tornado" had gone through it when the police were done. However, all of the items in the closet with the hole to the attic were undisturbed. Freeman had never seen either of the guns that were confiscated by police in her home. According to her, neither J. Vaughn nor R. Vaughn went into her attic and neither could fit in the attic.

Freeman testified that neither Stubbs nor Sindle ever contacted her. She said that she would have been willing to talk to either of them, and she would have testified at both J. Vaughn's and R. Vaughn's trials. She never told either J. Vaughn or R. Vaughn that she did not want to talk to their lawyers. Freeman visited Tennessee on at least five occasions between the time of the Vaughns' arrests and their trials. On those occasions, she never attempted to see either J. Vaughn or R. Vaughn, and she never contacted either of their attorneys.

George E. Simpson, Jr. ("Simpson"), Freeman's son, also testified at the post-conviction hearing. He lived with his mother in Sheffield, Alabama. He said that he never saw the guns that the officers found, and he was unaware that there were any guns in the house. Simpson testified that he was never contacted by Stubbs or Sindle, and he said that, had he been contacted, he would have testified on the behalf of both J. Vaughn and R. Vaughn.

Testifying on his own behalf at the post-conviction hearing, J. Vaughn said that he did not tell Stubbs that he was not in Sheffield, Alabama; rather, he told him that he was not at the house when it was searched. He was in Sheffield on the day that the house was searched but had left the house earlier that day to visit a female friend. He spent the night at his friend's house, and he left Alabama for Tennessee the following day. He testified that he never entered the attic of the house.

J. Vaughn said he gave Stubbs the telephone number of his Alabama relatives, including Freeman, because he wanted Stubbs to contact them. He denied that he ever told Stubbs not to contact his Alabama relatives. He also gave Stubbs the names of three or four alibi witnesses. Vaughn testified that Stubbs told him that he was facing a life sentence and that a life sentence was twenty-five years. He said that Stubbs never went over the jury instructions with him.

R. Vaughn also testified at the post-conviction hearing. R. Vaughn stated that he wrote to Sindle telling him that he wanted Sindle to file a motion to suppress the weapons found in Alabama and wanted him to contact his sister, Freeman, who was renting the house that was searched. He provided Sindle with Freeman's address and phone number. He believed that Sindle never contacted

any of his alibi witnesses because they were not in court.

R. Vaughn made an offer of proof with respect to the testimony of Thomas D. Walker ("Walker"), which the court ruled to be inadmissible. Walker, a relative of one of the victims, testified that, on the night of the shooting, he saw R. Vaughn at a store, and at the time the first shots were fired, he was in the same parking lot as R. Vaughn. Walker said that he had told investigators what he had seen, and Sindle never contacted him. Sindle's list of alibi witnesses did not include Walker.

Finally, both Stubbs and Sindle testified as to the instructions that the trial judge gave to the jury. The juries in both trials were instructed that if they found the defendant guilty of first degree murder the trial court would impose a sentence of life in prison, which carried a minimum sentence of twenty-five calendar years. Stubbs testified that he had determined that this instruction and the statute "appeared to be consistent with each other." Stubbs subsequently learned that at the time of the offense at issue Tennessee Code Annotated section 40-35-501 had been amended effective July 1, 1995 so as to change the release eligibility date for persons convicted of committing first degree murder and sentenced to life in prison with the possibility of parole from twenty-five years to fifty-one years. See Criminal Sentencing Reform Act of 1989, ch. 492, sec. 1, § 40-35-501, 1995 Tenn. Pub. Acts. He said that the issue about the release eligibility date was not brought to light until the Attorney General issued an advisory opinion on July 1, 1997, which was almost a year after he filed the direct appeal. Stubbs said that neither he, the judge, nor the prosecutor knew that this amended statute changed the release eligibility date.

Sindle also admitted that at the time of trial he was unaware that there was a statute that had changed the release eligibility for a life sentence from twenty-five years to fifty-one years. He said that he was "not sure that anyone knew . . . the way the statute was interpreted at that time." When Sindle filed an appeal on R. Vaughn's behalf on May 6, 1997, he believed that the minimum time served for a life sentence was twenty-five years in prison. After he submitted the briefs to the Court of Criminal Appeals, he learned that, according to an Attorney General's opinion, the minimum time served for a life sentence was fifty-one years.

Based on the foregoing evidence, the post-conviction court dismissed both J. Vaughn's and R. Vaughn's petitions for post-conviction relief, finding that neither had been denied his constitutional right to effective counsel. The Court of Criminal Appeals upheld the dismissals, and we granted both Vaughns' applications for permission to appeal. On appeal to this Court, J. Vaughn raises the issues of the failure to object to the erroneous jury instruction on release eligibility, the failure to file the motion to suppress, and the prejudice arising therefrom. R. Vaughn raises multiple issues, including the failure to object to the erroneous jury instruction on release eligibility.

## II. Standard of Review

A post-conviction court's findings of fact are conclusive on appeal unless the evidence preponderates otherwise. Nichols v. State, 90 S.W.3d 576, 586 (Tenn. 2002). "When reviewing

factual issues, the appellate court will not re-weigh or re-evaluate the evidence; moreover, factual questions involving the credibility of witnesses or the weight of their testimony are matters for the trial court to resolve." Id.; see also Henley v. State, 960 S.W.2d 572, 579 (Tenn. 1997). The appellate court's review of a legal issue, or of a mixed question of law or fact such as a claim of ineffective assistance of counsel, is de novo with no presumption of correctness. Nichols, 90 S.W.3d at 586; State v. Burns, 6 S.W.3d 453, 461 (Tenn. 1999).

### III. Analysis

In order to prevail on a post-conviction petition, the petitioner must establish that his conviction or sentence is void or voidable due to the abridgement of a constitutional right. Tenn. Code Ann. § 40-30-103 (2003); Howell v. State, 151 S.W.3d 450, 460 (Tenn. 2004). The petitioner bears the burden of proving factual allegations in the petition for post-conviction relief by clear and convincing evidence. Tenn. Code Ann. § 40-30-110(f) (2003); Wiley v. State, 183 S.W.3d 317, 325 (Tenn. 2006). It is well-settled that the abridgement of the right to effective assistance of counsel is a proper ground for post-conviction relief. See, e.g., Dean v. State, 59 S.W.3d 663 (Tenn. 2001); House v. State, 44 S.W.3d 508 (Tenn. 2001); Goad v. State, 938 S.W.2d 363 (Tenn. 1996).

The right of a person accused of a crime to representation by counsel is guaranteed by both the Sixth Amendment to the United States Constitution and article I, section 9, of the Tennessee Constitution. See Burns, 6 S.W.3d at 461; Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975). Both the United States Supreme Court and this Court have recognized that this right to representation "encompasses the right to 'reasonably effective' assistance, that is, within the range of competence demanded of attorneys in criminal cases." Burns, 6 S.W.3d at 461 (citing Strickland v. Washington, 466 U.S. 668, 687 (1984), and Baxter, 523 S.W.2d at 936).

The overall standard by which effective assistance of counsel is judged is "whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." Strickland, 466 U.S. at 686. To succeed on a claim of ineffective assistance of counsel, a petitioner must establish both that counsel's performance was deficient and that the deficiency prejudiced the defense. Baxter, 523 S.W.2d at 936; Strickland, 466 U.S. at 687. To prove a deficiency, a petitioner must show that counsel's acts or omissions were so serious as to fall below an objective standard of "reasonableness under prevailing professional norms." Strickland, 466 U.S. at 688. To prove prejudice, a petitioner must establish a reasonable probability that but for counsel's errors the result of the proceeding would have been different. Id. at 694. A "reasonable probability is a probability sufficient to undermine confidence in the outcome." Id.

We have never adopted an exhaustive list of criteria for counsel to satisfy in all cases. However, in Baxter, we cited with approval the duties and criteria set forth in the American Bar Association Standards for the Defense Function:

(1) Counsel should confer with his client without delay and as often as necessary to

8

elicit matters of defense, or to ascertain that potential defenses are unavailable. Counsel should discuss fully potential strategies and tactical choices with his client.

(2) Counsel should promptly advise his client of his rights and take all actions necessary to preserve them. . . .

(3) Counsel must conduct appropriate investigations, both factual and legal, to determine what matters of defense can be developed. . . . This means that in most cases a defense attorney, or his agent, should interview not only his own witnesses but also those that the Government intends to call, when they are accessible. The investigation should always include efforts to secure information in the possession of the prosecution and law enforcement authorities. And, of course, the duty to investigate also requires adequate legal research.

Baxter, 523 S.W.2d at 932-33 (quoting United States v. DeCoster, 487 F.2d 1197, 1203-04 (D.C. Cir. 1973)); see also Dean, 59 S.W.3d at 667; Burns, 6 S.W.3d at 462.

### A. Jury Instruction Regarding Release Eligibility Date

The trial court in both cases instructed the jury that a person convicted of first degree murder would be eligible for release after serving twenty-five years. However, the actual earliest release eligibility date for a person convicted of first degree murder was fifty-one years. See Tenn. Code Ann. § 40-35-501(i) (2003). Both Vaughns allege that their lawyers were ineffective for failing to object to the trial court's erroneous instruction to the jury regarding the release eligibility date. The State responds that, while the instruction was erroneous, counsel were not ineffective for failing to object because, at the time of trial, there were conflicting provisions in Tennessee Code Annotated section 40-35-501 as to the actual release eligibility date for a person convicted of first degree murder.

We have previously held that an attorney's failure to object to erroneous jury instructions regarding the applicable range of punishment constitutes ineffective assistance of counsel requiring reversal of the conviction and remand for a new trial. Dean, 59 S.W.3d at 668-69. In Dean, the trial judge instructed the jury that the range of punishment for second degree murder was three to ten years, when in fact it was eight to thirty years. Moreover, the range applicable to the defendant as a Range II multiple offender was twelve to twenty years. We held:

In our view, effective counsel must be aware of the possible punishments applicable to his or her client and must be informed and attentive when the trial court's instructions to the jury embrace such an obviously critical matter. Moreover, our decision in State v. Cook, which emphasized that an erroneous range of punishment instruction similar to that given in this case constitutes reversible error, was decided *four years* prior to the trial in this case and an effective counsel should have been aware of it. See 816 S.W.2d 322 (Tenn. 1991).

9

Dean's trial counsel nevertheless failed to notice the incorrect jury instruction, failed to be aware of the appropriate ranges of punishment, failed to object to the erroneous instruction during trial, and failed to preserve the erroneous instruction for appeal by listing it in the motion for a new trial. Dean's appellate counsel likewise failed to raise the issue on direct appeal. All of these functions are basic, yet essential, for preserving and raising errors under our rules of appellate procedure. See Tenn. R. App. P. 3(e). In our view, therefore, the performance of counsel was deficient under the prevailing standards in Baxter and Strickland.

Id. at 668.

While Dean dealt with an erroneous instruction regarding the range of punishment, we have also held that erroneous instructions regarding release eligibility constitute reversible error. See State v. Meyer, 994 S.W.2d 129 (Tenn. 1999). When a trial court instructs the jury as to the range of sentence for a particular offense, "[s]uch instruction shall include an approximate calculation of the minimum number of years a person sentenced to imprisonment for the offense charged and lesser included offenses must serve before reaching such person's earliest release eligibility date." Tenn. Code Ann. § 40-35-201(b)(2)(A)(i).[4]

There is no dispute over the fact that counsel in both cases were unaware of the trial court's erroneous instruction regarding release eligibility and remained unaware of the error throughout the appellate process. However, the Court of Criminal Appeals held that counsel should not be faulted for failing to object to the erroneous instruction because conflicting statutory provisions created uncertainty in the law at the time the case was tried.

Prior to July 1, 1995, the release eligibility of a defendant sentenced to life in prison was governed by Tennessee Code Annotated section 40-35-501(h)(1). This section provided:

> Release eligibility for each defendant receiving a sentence of imprisonment for life for first degree murder shall occur after service of sixty percent (60%) of sixty (60) years less sentence credits earned and retained by the defendant, but in no event shall a defendant sentenced to imprisonment for life be eligible for parole until the defendant has served a minimum of twenty-five (25) full calendar years of such sentence . . . .

Tenn. Code Ann. § 40-35-501(h)(1). On June 12, 1995, the Legislature passed Public Act Chapter 492 which amended Tennessee Code Annotated section 40-35-501 by adding subsection (i), which states in pertinent part:

---

[4] We note that effective May 18, 1998, the Tennessee General Assembly amended Tennessee Code Annotated section 40-35-201, deleting subsection (b) and replacing it with a new provision providing that juries in noncapital cases shall not be instructed on the possible penalties for the offense charged or lesser included offenses. Criminal Sentencing Reform Act of 1989, ch. 1041, sec. 2, § 40-35-201, 1998 Tenn. Pub. Acts. This amendment does not apply to cases tried before the effective date of the amendment. Id.

10

There shall be no release eligibility for a person committing an offense, on or after July 1, 1995, that is enumerated in subdivision (i)(2). Such person shall serve one hundred percent (100%) of the sentence imposed by the court less sentence credits earned and retained. However, no sentence reduction credits authorized by § 41-21-236, or any other provision of law, shall operate to reduce the sentence imposed by the court by more than fifteen percent (15%).

Tenn. Code Ann. § 40-35-501(i). The passage of section 40-35-501(i) did not repeal section (h), as section (h) still applies to a person committing an offense before July 1, 1995. However, it was not expressly stated that section (h) would no longer apply to a person committing an offense on or after July 1, 1995. Accordingly, at the time of both trials, both section (h), providing for release eligibility after twenty-five years, and section (i), providing for release eligibility only after fifty-one years, were in effect.

Tennessee Code Annotated section 40-35-501(i), which went into effect on July 1, 1995, was in effect at the time that the offenses were committed, and a full eleven months before the cases went to trial. While the amendment raised the question as to which section of the statute applied to these cases at the time of trial, that does not excuse counsel in these cases. As we stated in Dean, "effective counsel must be aware of the possible punishments applicable to his or her client and must be informed and attentive when the trial court's instructions to the jury embrace such an obviously critical matter." 59 S.W.3d at 668.

That there was a conflict in the provisions, far from excusing counsel from raising the issue, should have brought to their attention the very need to raise the issue. Counsel's failure to raise the issue is a direct result of their failure to apprise themselves of the current sentencing provisions when the case went to trial. As for the conflict in the statutes, well-settled principles of statutory construction make it clear that the most recently enacted statute repeals by implication any irreconcilable provisions of the former act. See, e.g., Tennessee-Carolina Transp., Inc. v. Pentecost, 362 S.W.2d 461, 463 (Tenn. 1962).

The Attorney General issued an opinion on July 1, 1997, in an attempt to clarify the effect of the amendment on the prior statutory language. The Attorney General based his opinion on "long established rules of statutory construction" and concluded:

*The only reasonable resulting interpretation* would be that subsection (i) operates, in so far as it conflicts with the provisions of the existing statute governing release eligibility, to raise the floor from 60% of sixty years . . . to 100% of sixty years, reduced by not more than 15% of eligible credits.

Tenn. Op. Att'y Gen., No. 97-098 (1997) (emphasis added.) Even if counsel in these cases had not become aware of the conflict, or aware of the conflict's impact on the sentencing in these cases, until the Attorney General's July 1997 opinion, they still had sufficient opportunity to bring the issue to the attention of the Court of Criminal Appeals as plain error, as that court's opinions were not

11

entered until April and May of 1998.

Both J. Vaughn's and R. Vaughn's trial counsel failed to apprise themselves of the correct release eligibility dates for the possible convictions and therefore failed to notice and object to the incorrect jury instruction; both likewise failed to raise the issue on direct appeal even after the conflict in language was clarified by the Attorney General. Therefore, we hold that the performance of counsel in both cases was deficient under the prevailing standards in Baxter and Strickland.

Having determined that counsel's representation was deficient we must next determine whether that deficiency prejudiced the defense. See Baxter, 523 S.W.2d at 936; Strickland, 466 U.S. at 687. To prove prejudice, a petitioner must establish a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different, with "a reasonable probability" being defined as a "probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694.

In Dean, after holding counsel deficient for failing to object to erroneous jury instructions regarding the range of the sentence, we held that the deficiency prejudiced the defense.

> [W]e believe that the deficiency in performance was prejudicial given the critical nature of the error that was permitted to occur without objection or appeal. . . . In our view, it is reasonably probable that had counsel objected to and appealed the erroneous jury instruction, the result would have been different and the petitioner would have received a new trial on the offense of attempted second degree murder under our decision in Cook. Accordingly, we hold that the petitioner was prejudiced by the deficient performance of counsel.

Dean, 59 S.W.3d at 668-69.

Previously, in State v. Cook, 816 S.W.2d 322, 326-27 (Tenn. 1991), this Court held that Tennessee Code Annotated section 40-35-201(b) "gives a defendant a claimable statutory right to have the jury know the range of punishment applicable to the charges before deciding guilt or innocence" and to deny this "statutory right constitutes prejudice to the judicial process, rendering the error reversible under Rule 36(b) T.R.A.P." The trial court in Cook had charged the jury with Range I sentence ranges although, in reality, the defendant was an aggravated Range II offender. He was sentenced to Range II sentences of twenty-five years on each of his three aggravated rape convictions and seven years on each of his two aggravated sexual battery convictions. We reversed the convictions and remanded the charges to the trial court for a new trial, finding the error in the jury instructions to be prejudicial. Id.

We observed in Cook:

It is widely perceived by those who observed the operations of our trial courts in

12

previous times, when juries had the additional responsibility of setting punishment, that often they seemed to find guilt of a crime not necessarily most strongly suggested by the evidence, but one the punishment for which suited their sense of justice for the case. Apparently the Legislature desired to give those charged with crimes the option of making certain that the jury knew the punitive consequences of guilty verdicts in the cases under consideration. . . .

Id. at 326-27. Furthermore, we specified in Cook that prejudice occurs when a defendant receives a sentence greater than the range of punishment contemplated by the jury. Cook, 816 S.W.2d at 327; see also Dean, 59 S.W.3d at 669.

This rationale from Cook was reaffirmed in State v. Meyer, 994 S.W.2d 129 (Tenn. 1999). In Meyer, we held that a trial court's instruction to the jury, which contained an inaccurate release eligibility date for the charged offense, was reversible error. Id. at 132. Meyer was convicted of two counts of rape of a child. Id. at 131. The trial court instructed the jury that he would be eligible for release following a conviction of child rape after serving 5.73 years of his sentence, when in reality, a defendant convicted of child rape is not eligible for early release and must serve the entire sentence imposed. Id. The Court of Criminal Appeals acknowledged the error but found it to be harmless due to "substantial" evidence in support of a conviction. Id. This Court found that, despite the strength of the evidence, it was reasonably probable that the defendant would have been convicted of a lesser offense had the jury known that he would not be eligible for early release. Id. at 132 We reversed the conviction and remanded for a new trial. Id.

As in Cook and Meyer, the jury in each case was given an erroneous instruction regarding the length of sentence to be served. The juries were instructed that, if convicted of first degree murder, the defendant would be eligible for release after twenty-five years, when in fact, he would not be eligible for release until the completion of fifty-one years. Thus, J. Vaughn and R. Vaughn received greater sentences than contemplated by the juries. It is reasonably probable that the juries would have convicted J. Vaughn and R. Vaughn of a lesser offense had they been read a correct instruction on release eligibility. Accordingly, we conclude that the deficiency in both counsel's representation prejudiced the defense. We must, therefore, reverse the convictions for first degree murder of both J. Vaughn and R. Vaughn, and remand for new trials.

### B. J. Vaughn: Motion to Suppress Weapons

J. Vaughn argues that counsel was ineffective for failing to file a motion to suppress the weapons found during the search of his aunt's house in Sheffield, Alabama, and for failing to investigate the circumstances surrounding the search. He argues that the guns used as evidence against him were obtained in a search that went beyond the scope of the search warrant.

In order to succeed in proving ineffective assistance of counsel with respect to counsel's failure to file a motion to suppress the evidence, J. Vaughn must satisfy both prongs of the Strickland

13

test, showing that counsel's failure to file the motion was deficient and that the deficient performance prejudiced the defense. Strickland, 466 U.S. at 687. Here, J. Vaughn has failed to show that counsel's actions were so deficient as to fall below the objective standard of "reasonableness under prevailing professional norms." Id. at 688.

The trial court found not credible J. Vaughn's testimony that he was in Alabama and that he wanted Stubbs to contact his Alabama relatives. Instead, the trial court credited counsel's testimony that J. Vaughn consistently denied being in Alabama and refused to involve his family. The trial court's findings of fact are conclusive on appeal unless the evidence in the record preponderates against those findings. See Burns, 6 S.W.3d at 461; State v. Keith, 978 S.W.2d 861, 864 (Tenn. 1998). Moreover, factual questions that involve assessing the credibility of witnesses, or the weight and value to be given their testimony, are matters for resolution by the trial court. Burns, 6 S.W.3d at 461. The evidence presented at the post-conviction evidentiary hearing does not preponderate against the trial court's findings.

Counsel did not file a motion to suppress because it would have directly contradicted J. Vaughn's defense of mistaken identity and compromised the credibility of the defense in the eyes of the jury. Additionally, if J. Vaughn was never in Alabama, he would have no standing to file the motion. Given J. Vaughn's insistence that he was never in Alabama, counsel's decision not to file a motion to suppress the guns was a legitimate tactical decision that does not deviate from the "prevailing professional norms." See Strickland, 466 U.S. at 688. Tactical choices made by counsel are given deference, and the courts must not measure trial counsel's deficiency by "20-20 hindsight." Cooper v. State, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992). Because we hold that counsel's conduct was not deficient in failing to file a motion to suppress the evidence obtained from the search, we need not address the issue of whether counsel's conduct was prejudicial.

### C. R. Vaughn: Additional Issues

#### 1. Pre-trial motion to suppress evidence

R. Vaughn argues that Sindle was ineffective by failing to investigate adequately and prepare for the pre-trial motion to suppress the gun found at the residence in Alabama. Specifically, R. Vaughn argues that Sindle should have called his Alabama relatives as witnesses at the suppression hearing to establish standing to challenge the validity of the search warrant. If Sindle had put on such proof, he could have challenged the search as exceeding the scope of the warrant, thereby preventing the introduction of the gun into evidence.

The trial court at the post-conviction hearing credited Sindle's testimony that R. Vaughn had told him unequivocally not to involve his relatives in the case and that it was for this reason that Sindle did not call the relatives to testify at the suppression hearing. The trial court found R. Vaughn's testimony to the contrary to be not credible.

Because of the deference given to the trial court's findings of fact, particularly with regard

14

to issues of credibility, <u>see</u> <u>Burns</u>, 6 S.W.3d at 461, we hold that the evidence presented at the post-conviction hearing does not preponderate against the trial court's finding that Sindle's conduct with respect to the motion to suppress was not deficient. Therefore, R. Vaughn has failed to satisfy the first prong of the <u>Strickland</u> test, which requires the petitioner to show that counsel's actions were so deficient as to fall below the objective standard of "reasonableness under prevailing professional norms." <u>See</u> <u>Strickland</u>, 466 U.S. at 688. Furthermore, R. Vaughn failed to show prejudice. Even if the gun had not been introduced into evidence, there were multiple eyewitnesses who identified him as one of the shooters.

## 2. Jury instructions regarding mental state

R. Vaughn argues that Sindle was ineffective by failing to object to the jury instructions on the definition of "knowingly" with respect to the second degree murder charge. The trial court instructed the jury:

> For you to find the defendant guilty of this offense [of second degree murder] the State must prove beyond a reasonable doubt the existence of the following essential elements:
>
> 1. That the Defendant unlawfully killed the alleged victim; and
> 2. That the Defendant acted knowingly. Knowingly means that a person acts knowingly with respect to the conduct or the circumstances surrounding the conduct when the person is aware of the nature of the conduct or that the circumstances exist. A person acts knowingly with respect to the result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result.

R. Vaughn relies on <u>State v. Keith T. Dupree</u>, No. W1999-01019-CCA-R3-CD, 2001 WL 91497 (Tenn. Crim. App. Jan. 30, 2001), and <u>State v. Page</u>, 81 S.W.3d 781 (Tenn. Crim. App. 2002). In <u>Page</u>, the Court of Criminal Appeals interpreted the definition of "knowingly," holding that second degree murder is strictly a "result of conduct offense," and a jury instruction allowing a jury to convict based only "upon awareness of the nature of the conduct or circumstances surrounding the conduct" improperly lessened the State's burden of proof. 81 S.W.3d at 788.

<u>Page</u> was decided six years after R. Vaughn's trial. We agree with the post-conviction court that Sindle cannot be held ineffective for failing to anticipate Court of Criminal Appeals' holding with regard to the jury charge on the mens rea of "knowingly." Moreover, in <u>State v. Faulkner</u>, 154 S.W.3d 48, 59 (Tenn. 2005), this Court limited the holding in <u>Page</u>, concluding that "[t]he superfluous language in the 'knowingly' definition did not lessen the burden of proof because it did not relieve the State of proving beyond a reasonable doubt that the defendant acted knowingly."

## 3. Investigation of state's witnesses and alibi witnesses

R. Vaughn makes several arguments with respect to witnesses. First, he argues that Sindle

15

was deficient for not interviewing all of the State's witnesses. He argues that this conduct falls below the standard for adequate trial preparation that was discussed in Baxter, namely that a defense attorney should ensure that "all available defenses are raised" by interviewing "not only his own witnesses but also those that the government intends to call, when they are available." 523 S.W.2d at 933.

The Court of Criminal Appeals held that Sindle was not deficient in this respect because he reviewed the State's discovery, and he also watched parts of J. Vaughn's trial in which many of the same witnesses were called and cross-examined. We agree. Moreover, R. Vaughn has failed to show any prejudice–he offered no evidence at the post-conviction hearing as to the benefit that such additional interviews would have provided.

Second, R. Vaughn argues that Sindle failed to adequately establish his alibi defense. R. Vaughn argues that Sindle was deficient for only calling one alibi witness, Robin Malone ("Malone"), whose testimony was then impeached with a prior inconsistent statement. Malone testified that she saw R. Vaughn outside a club called Big Robert's, which is approximately two to three blocks from Wing-Its, immediately before hearing shots fired. However, the State offered rebuttal testimony from Detective Susan Morrow who had interviewed Malone before the trial, and according to Morrow, Malone stated that she had seen R. Vaughn running on Blythe Street immediately after hearing shots fired. Blythe Street is not next to Big Robert's, but is in the general area behind Wing-Its.

Sindle explained at the post-conviction hearing that before he decided to call Malone as a witness, he specifically asked her if she had given any prior statements, which she denied doing. Sindle found Malone to be a credible witness and attempted to ensure that she had not given any other information to the police. Given these circumstances, the fact that she was then impeached by an inconsistent statement does not make Sindle's decision to call her as a witness deficient. Again, tactical choices made by counsel are given deference and the courts must not measure trial counsel's deficiency by "20-20 hindsight." Cooper, 847 S.W.2d at 528.

R. Vaughn also contends that Sindle should have called Sammy Alexander ("Alexander") as a witness because Alexander's testimony would have cast doubt on the credibility of one of the State's key eyewitnesses, Keith Goodrich ("Goodrich"). At J. Vaughn's trial, Alexander testified that Goodrich had told him that the shooters were wearing ski masks. Sindle chose not to call Alexander as a witness. He explained that there were credibility problems with many of the witnesses, and he had to decide whether Alexander would do more harm than good to the defense. Alexander had previously been convicted of voluntary manslaughter. Thus, Sindle's decision not to call him as a witness was a legitimate tactical decision that does not deviate from the "prevailing professional norms." See Strickland, 466 U.S. at 688.

Finally, R. Vaughn argues that Sindle was ineffective for failing to call Walker. However, the post-conviction court found that Walker's testimony was inadmissible, and also found that "Walker did not make a credible witness." Great weight is given to a trial court's assessment of

credibility, see Burns, 6 S.W.3d at 461, and the evidence does not preponderate against the trial court's findings.

### 4. Other suspects

R. Vaughn asserts that Sindle failed to develop information with respect to other suspects, namely Charles Crenshaw ("Crenshaw"). According to R. Vaughn, Crenshaw was shot by one of the victims on a prior occasion. Pretrial, the trial court ruled that Detective Morrow could be asked if she had developed any other suspects in the case, but she could not be asked about specific names. The post-conviction court found that Sindle concluded that if he had pursued a line of questions about other possible suspects, Detective Morrow would have responded that "all the evidence pointed to your client." Therefore, Sindle's decision not to delve into the issue was a strategic one, which we will not second-guess on appeal. See Cooper, 847 S.W.2d at 528. Furthermore, R. Vaughn failed to show how he was prejudiced, as neither Charles Crenshaw nor Detective Morrow testified at the post-conviction hearing.

### 5. Sequestered jury

R. Vaughn argues that Sindle should have requested a sequestered jury. In response, Sindle testified that, with a sequestered jury, there is the risk that the jury will not take its time with the evidence in a rush to get home. The post-conviction court found that the jury was questioned extensively about whether it had read or heard about the case, and none of the jurors had. The Court of Criminal Appeals correctly affirmed the holding of the trial court that Sindle's decision not to request a sequestered jury was a tactical decision based upon a number of valid considerations. Furthermore, R. Vaughn has not shown that this was an unreasonable strategy, nor has he shown any prejudice.

### 6. Sentencing

R. Vaughn argues that Sindle was ineffective for failing to offer mitigating evidence during sentencing. Sindle testified that, while he could have argued some mitigating factors, his arguments would have lacked any validity. The trial court agreed and rejected all of the factors suggested by the defendant. As the Court of Criminal Appeals held, because no mitigating factors apply, Sindle was not deficient for failing to offer mitigating evidence at the sentencing hearing, and R. Vaughn has not shown how he was prejudiced by Sindle's failure to offer such proof.

### 7. Detective Morrow's testimony

Finally, R. Vaughn argues that Sindle was ineffective for failing to object or to request a mistrial when Detective Morrow violated a motion in limine by testifying that R. Vaughn had been incarcerated. At the post-conviction hearing, Sindle explained that the reference was very brief and that he did not want to draw the jury's attention to it by objecting. He did not request a mistrial because he had an alibi witness, and he thought it was in R. Vaughn's best interest to continue with

the trial. The Court of Criminal Appeals did not find Sindle deficient in this regard and held that, even assuming a showing of deficient performance, R. Vaughn failed to show prejudice because the most he could expect was an instruction to the jury to disregard the reference. We agree.

## IV. Conclusion

In sum, we hold that in both cases counsel's failure to object to the erroneous jury instructions regarding the release eligibility date for a person convicted of first degree murder was deficient and prejudicial, thus denying each petitioner of his constitutional right to effective counsel. Therefore, we reverse both petitioners' convictions for first degree murder and remand for new trials on that charge. We hold that both counsel's conduct with respect to the other issues was not deficient and therefore does not merit relief to the petitioners as to the other convictions.

Costs of both appeals are taxed to the State of Tennessee, for which execution may issue if necessary.

_____
WILLIAM M. BARKER, CHIEF JUSTICE