IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs February 8, 2011

**ALISHA J. GLISSON v. STATE OF TENNESSEE**

**Direct Appeal from the Criminal Court for Davidson County**
**No. 2002-C-1508     Seth Norman, Judge**

_____

**No. M2010-01483-CCA-R3-PC - Filed August 30, 2011**

_____

The Petitioner, Alisha J. Glisson, appeals the denial of post-conviction relief by the Davidson County Criminal Court. She was convicted of felony murder, aggravated robbery, and three counts of attempted aggravated robbery and received an effective sentence of life imprisonment. The sole issue raised in this appeal is whether trial counsel was ineffective by failing to subpoena a co-defendant at trial. Upon review, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and D. KELLY THOMAS, JR., JJ., joined.

Ryan C. Caldwell, Nashville, Tennessee, for the Petitioner-Appellant, Alisha J. Glisson.

Robert E. Cooper, Jr., Attorney General and Reporter; Rachel E. Willis, Senior Counsel, Assistant Attorney General; Victor S. (Torry) Johnson, III District Attorney General; and Dan Hamm, Assistant District Attorney General, for the Appellee, State of Tennessee.

**OPINION**

**Background**. As pertinent to this case, the Petitioner was indicted, along with three accomplices, Michael Wayne Henry, Andrew N. Warner, and David Sullivan, Jr., for a robbery resulting in the shooting death of William R. "Randy" St. Laurent ("the victim"). Based on the proof adduced at trial, the Petitioner, along with her accomplices, devised a plan while gathered at the Petitioner's apartment to rob the victim. The plan was to rob the victim's apartment while the victim was out with the Petitioner and share the proceeds. The Petitioner was dating co-defendant Sullivan; however, Sullivan did not testify at trial. Co-defendants Henry and Warner testified against the Petitioner at trial.

After going into the wrong apartment, the co-defendants entered the victim's apartment and demanded drugs from the victim's girlfriend. They took money and jewelry from the victim's girlfriend. They then returned to their earlier meeting place and telephoned

> [the Petitioner] "to find out where [the victim] was at with his stuff." According to Henry, [the Petitioner] was "riding around" with the victim in a limousine. The [Petitioner] informed them that she had seen the "stuff" earlier in the evening but that she did not know if he still had it on him. The Defendant also relayed that she and the victim would be ending the evening at her apartment.

> Henry drove to [the Petitioner's] apartment, and the three men waited for [the Petitioner] and the victim to return. The men remained in contact with [the Petitioner] by telephone until she returned to her apartment. According to Henry, as the limousine was nearing the apartment, [the Petitioner] stated "don't do it" and claimed that she wanted no further part in the robbery plan. Warner testified that he never heard the [Petitioner] say anything about aborting the plan.

> . . . .

> The State also called Meredith Runion, who testified that she was in the limousine with [the Petitioner] and the victim on the evening of December 14. She also stated that, after leaving the limousine, she accompanied [the Petitioner] to a motel parking lot and that, from there, they returned to [the Petitioner's] apartment. After returning to [the Petitioner's] apartment, Ms. Runion changed clothes, and the victim arrived to pick them up. Ms. Runion then observed "two or three" men dressed in black use a "taser gun" on the victim, and she heard a gunshot.

> [In a statement to police] [the Petitioner] admitted that she devised a home invasion plan with Warner, Sullivan, and Henry "to get [the victim's] weed while he was not home." She further acknowledged that she knew the three men had gone to the victim's apartment and not found anything valuable. After the unsuccessful robbery of the apartment, the plan changed to robbing the victim of what he "had on him." She also stated that she went to a motel parking lot that evening looking for Henry. A videotape of the interview was entered into evidence and played for the jury.

-2-

State v. Alisha J. Glisson, No. M2006-02115-CCA-R3-CD, 2008 WL 624929, at *3-4 (Tenn. Crim. App., at Nashville, Mar. 5, 2008), perm. to appeal denied (Tenn. Aug. 25, 2008).

The Petitioner appealed her convictions and sentence, both of which were affirmed on direct appeal to this court. Id. at *1. She then filed a pro se petition for post-conviction relief alleging, among other things, the ineffective assistance of trial counsel. Following appointment of counsel and an amended petition, an evidentiary hearing was held.

**Post-Conviction Hearing**. David Sullivan, who entered a guilty plea to second-degree murder of the victim in this case, testified at the post-conviction hearing that he was never approached by any lawyer or investigator in regard to testifying on behalf of the Petitioner. Had he been notified he would have been willing to testify. He expressed his familiarity with the other co-defendants in the case and confirmed that they met at the Petitioner's apartment to discuss a robbery. He recalled the following regarding the discussions:

> Well, in my mind, what it was, was I needed some money, and I knew that she knew a drug dealer. So I was going to set it up like I was going to buy some dope from him, some drugs, and me and Michael Wayne Henry and Andrew Warner were going to go and rob him, but they didn't know that.

Sullivan recounted the events leading up to the robbery and confirmed that the Petitioner told him where to find the victim that night. He stated, "There really was no point that anyone but me was in charge, to tell you the truth, because I was the one who orchestrated it. . . . I manipulated them so I would get what I wanted[.]" After getting the money from the victim's girlfriend, Sullivan stated that he telephoned the Petitioner to determine where the victim was and when they would return. During this conversation, Sullivan told the Petitioner that he was "trying to get [the victim's] dope." Sullivan stated, "At the time it wasn't about a robbery, it was about a drug deal. [He] turned it into a robbery."

Sullivan said the victim "wouldn't have died if I hadn't gone to rob him." He described the Petitioner's role by stating "She knew a drug dealer, and I wanted to know him, and I stepped all over her to get to him." On cross-examination, Sullivan claimed that he only told the Petitioner that he wanted to buy drugs from the victim and was unsure at what point she became aware of his plans for a robbery.

The Petitioner testified that she was initially appointed a public defender and later hired "paid" counsel. Although she could not remember the specifics of why she retained additional counsel, the Petitioner believed that the public defender "wasn't doing what he

should or could for [her]. . . [and] put [her] confidence in a new attorney." She was however convinced by her new counsel that they would "have a better team" by keeping her initial counsel on in "second-chair capacity" because he was already familiar with her case. They hired Larry Flair, a private investigator, to talk to Sullivan. The Petitioner stated:

> [Flair] was to go and talk to my charge partner, the one that testified today, and basically, just get him to tell the truth. Get him to come to court and stand up here and take responsibility and say that, you know, I called Lish, I wanted to do a drug deal, and I basically used her to get to this drug dealer.
>
> We were either going to do a sworn affidavit or a subpoena to have him present at my trial, and [Counsel] did not want him at my trial. She told me flat out, He's a thug, [sic] he will just make us look bad. I was not happy with that but, you know, she was my attorney and I trusted that she, you know, knew what she was doing, you know, this was her job.

The Petitioner believed that, on the day of trial, she was going to testify against her co-defendants; however, she was told that "the State was going to use them to testify against you." She refused a plea bargain of 15 years at 45 percent for second degree murder because she had "waited in the county jail for four years" and wanted her "day in court." In regard to the circumstances of the offense, the Petitioner conceded that she intended to set up a drug deal on the night of the offense. Asked at what point in time she knew that the victim was going to be robbed, she stated, "Not for sure....it was talked about but how could I know anything? If I'm not doing it, how can I know." She agreed however that her co-defendants "talked about [the robbery] in [her] living room at [her] apartment in front of [her], they sure did."

Counsel testified that she had been practicing law with an emphasis in criminal defense for twenty years and had tried "several" felony murder cases. She was retained to represent the Petitioner by a friend of the Petitioner's. She confirmed that a public defender was assisting her in the case and that she was lead counsel. Counsel was unaware that the Petitioner was displeased with her representation. Counsel was suspicious of why Sullivan entered his guilty plea so quickly and determined, through her private investigator, "that Mr. Sullivan had committed some sort of offense while, like, in AWOL status [from the military] and was subject to possible life in Leavenworth. Part of his deal with the military was to plead to the second degree murder in this case[.]" Counsel recalled that the prosecutor "really believed that [the Petitioner] started this and was the mastermind." Consequently, counsel explained that they "were trying to get her out of that role and separate her as much as we could from the three bad guys because Sullivan was a thug . . . the other one brought the gun . . . and shot it, and she stayed inside of her apartment."

-4-

Counsel clarified that the Petitioner was offered a plea bargain for 15 years on the offense of facilitation, which could be served at 45 percent. Counsel explained that she had difficulty convincing the Petitioner to accept the plea bargain because the Petitioner did not believe "in her heart" that she was responsible for the victim's death. Counsel reasoned this was due to the Petitioner's inability to grasp the concepts of felony murder and criminal responsibility, despite counsel's repeated attempts to explain them. Asked whether she could have done anything "as far as trial strategy, witness calling. . . that would have negated what the jury heard, counsel replied, "No. As a matter of fact, we felt like we were participating in a pretty clean trial. We were able to exclude the phone records, which was a monumental step for the defense."

In a ten-page order denying relief, the post conviction court determined that trial counsel engaged in a "tactical maneuver implemented to curry favor with the jury" when she declined to subpoena or call Sullivan as a witness at trial. The post conviction court further reasoned:

> The Petitioner herself stated that [Counsel] did not want Mr. Sullivan to testify because she was of the opinion that he was a thug and his presence as a defense witness would make her look bad. [Counsel] testified that part of their defense strategy was to try and separate the Petitioner from the three men involved in order to portray the Petitioner in a more favorable light and downplay her participation in the commission of the crimes. Furthermore, any previous testimony of Mr. Sullivan would have only served to corroborate the State's proof in the matter.
>
> . . . .
>
> Based on [Counsel's] extensive criminal trial experience, counsel's decision to refrain from calling Mr. Sullivan as a witness was a sound strategic move in the opinion of the Court.

## ANALYSIS

The petitioner claims that the post-conviction court erred in denying relief. In response, the State argues that the post-conviction court did not err in denying relief. We agree with the State.

Post-conviction relief is only warranted when a petitioner establishes that his or her conviction is void or voidable because of an abridgement of a constitutional right. T.C.A. § 40-30-103 (2006). The Tennessee Supreme Court has held:

> A post-conviction court's findings of fact are conclusive on appeal unless the evidence preponderates otherwise. When reviewing factual issues, the appellate court will not re-weigh or re-evaluate the evidence; moreover, factual questions involving the credibility of witnesses or the weight of their testimony are matters for the trial court to resolve. The appellate court's review of a legal issue, or of a mixed question of law or fact such as a claim of ineffective assistance of counsel, is de novo with no presumption of correctness.

Vaughn v. State, 202 S.W.3d 106, 115 (Tenn. 2006) (internal quotation and citations omitted). "The petitioner bears the burden of proving factual allegations in the petition for post-conviction relief by clear and convincing evidence." Id. (citing T.C.A. § 40-30-110(f); Wiley v. State, 183 S.W.3d 317, 325 (Tenn. 2006)). Evidence is considered clear and convincing when there is no serious or substantial doubt about the accuracy of the conclusions drawn from it. Hicks v. State, 983 S.W.2d 240, 245 (Tenn. Crim. App. 1998) (citing Hodges v. S.C. Toof & Co., 833 S.W.2d 896, 901 n.3 (Tenn. 1992)).

Vaughn further repeated well-settled principles applicable to claims of ineffective assistance of counsel:

> The right of a person accused of a crime to representation by counsel is guaranteed by both the Sixth Amendment to the United States Constitution and article I, section 9, of the Tennessee Constitution. Both the United States Supreme Court and this Court have recognized that this right to representation encompasses the right to reasonably effective assistance, that is, within the range of competence demanded of attorneys in criminal cases.

Vaughn, 202 S.W.3d at 116 (internal quotations and citations omitted).

In order to prevail on an ineffective assistance of counsel claim, the petitioner must establish that (1) his lawyer's performance was deficient and that (2) the deficient performance prejudiced the defense. Id. (citing Strickland v. Washington, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064 (1984); Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975)). "[A] failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim. Indeed, a court need not address the components in any particular order or even address both if the [petitioner] makes an insufficient showing of one

component." Goad v. State, 938 S.W.2d 363, 370 (Tenn. 1996) (citing Strickland, 466 U.S. at 697, 104 S. Ct. at 2069).

A petitioner successfully demonstrates deficient performance when the clear and convincing evidence proves that his attorney's conduct fell below "an objective standard of reasonableness under prevailing professional norms." Id. at 369 (citing Strickland, 466 U.S. at 688, 104 S. Ct. at 2065; Baxter, 523 S.W.2d at 936). Prejudice arising therefrom is demonstrated once the petitioner establishes "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 370. "'A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" Id. (quoting Strickland, 466 U.S. at 694, 104 S. Ct. at 2068).

Upon our review, we conclude that the evidence does not preponderate against the findings of the post-conviction court. Counsel's strategy at trial was to separate the petitioner from her co-defendants, who counsel believed would reflect negatively on the Petitioner. Counsel testified that she did not call or subpoena Sullivan as a witness because she considered him a "thug" and did not want the jury to associate the Petitioner with him. Counsel communicated her concerns to the Petitioner, and the Petitioner trusted counsel's judgment. This court has previously stated, "[a]llegations of ineffective assistance of counsel relating to matters of trial strategy or tactics do not provide a basis for post-conviction relief." Taylor v. State, 814 S.W.2d 374, 378 (Tenn. Crim. App. 1991). "'This court does not sit to second guess strategic and tactical choices made by trial counsel. However, when counsel's choices are uninformed because of inadequate preparation, a defendant is denied the effective assistance of counsel.'" Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982) (quoting U.S. v. DeCoster, 487 F.2d 1197, 1201 (D.C. Cir. 1973). The record shows that counsel, a veteran criminal defense attorney, was more than prepared for the Petitioner's trial and engaged in a conscious decision not to call Sullivan. In our view, the root of the Petitioner's complaint is her inability to grasp the legal concepts of criminal responsibility and felony murder, not her lack of effective representation at trial. The Petitioner has failed to demonstrate deficient performance or prejudice as a result thereof. Accordingly, the Petitioner is not entitled to post-conviction relief.

_____
CAMILLE R. McMULLEN, JUDGE