IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs March 3, 2009

## THOMAS COTHRAN v. STATE OF TENNESSEE

**Direct Appeal from the Circuit Court for Hickman County**
**No. 07-5030C      Timothy Easter, Judge**

**No. M2008-01071-CCA-R3-PC - Filed December 3, 2009**

The Petitioner, Thomas Cothran, was convicted by a jury of four counts of aggravated vehicular homicide, three counts of vehicular assault, and one count of driving under the influence. The petitioner now appeals the denial of post-conviction relief, claiming the post-conviction court erred in finding that he received effective assistance of counsel. Upon our review of the record, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and ALAN E. GLENN, JJ., joined.

Patrick D. Frogge, Nashville, Tennessee, for the Petitioner-Appellant, Thomas Cothran.

Robert E. Cooper, Jr., Attorney General and Reporter; Melissa Roberge, Assistant Attorney General; Ronald L. Davis, District Attorney General; and Michael J. Fahey, Assistant District Attorney General, for the Appellee, State of Tennessee.

### OPINION

**Facts**. The facts of the underlying convictions, as outlined by this court in the petitioner's direct appeal, are described below:

> The convictions at issue in this case stem from a horrific motor vehicle accident that occurred the night of July 19, 2002. The Defendant lost control of his truck while driving on Interstate Forty (I-40) in rural Hickman County, crossed the median and careened head-on into a minivan, killing four individuals and seriously injuring three. The Defendant was indicted by a Hickman County grand jury in a seventeen-count indictment in December of 2002, and received a jury trial in December of 2003.

The record reflects that the victims, a family of seven, were driving east on I-40 from west Tennessee on their way to Maryland to visit the children's grandparents when the accident occurred shortly after 9:00 at night. The Defendant, a truck driver by profession, was traveling westbound on I-40 in a 19,000 pound garbage truck on his way to California. Mr. Donald Person testified that he was traveling eastbound on the same interstate that night and saw the Defendant's truck "acting erratically" on the opposite side of the interstate. Mr. Person slowed, and as he did he witnessed the garbage truck side-swipe another truck then suddenly cross the median, go "airborne," and hit the minivan traveling just in front of him.

Mr. Oscar Maynez, a professional truck driver, testified that he was following the garbage truck west-bound when he observed it "bump" the truck it was attempting to pass. Only moments earlier Mr. Oscar Maynez had been attempting to pass the Defendant's garbage truck himself when it cut in front of him, forcing him to apply his engine brakes and "back off." As he did, he saw the garbage truck signal right as if to pull back in behind the other truck in an aborted attempt to pass, but in doing so it side-swiped the truck and then started "going all over the road." Mr. Oscar Maynez stated that the Defendant "started fish-tailing, going crazy," and then "ran into the median . . . almost flipped over . . . then he got control again [and] he went airborne onto the east bound side."

Mr. Miles Faulkenham, a professional truck driver from Nova Scotia, Canada, testified that he was driving an empty tractor-trailer rig west-bound on I-40 that night, and first saw the Defendant in his rearview mirror as the Defendant attempted to pass him. Mr. Faulkenham stated that the Defendant approached fast, pulled up along side his rig, struck him on the side of his trailer, then "started to weave" and ultimately lost control and crossed the median.

Immediately after the accident, several eye witnesses stopped their vehicles and ran to the crash site. Mr. Person stated that he saw the Defendant climb out of his overturned truck, and as he did he "threw something out of the truck," which Mr. Person later determined to be a beer can. When Mr. Person tried to talk to the Defendant, the Defendant was "incoherent," and did not know where he was. Mr. Person also testified that he "smelled alcohol" on the Defendant; saw a twelve-pack of Old Milwaukee's Best beer near the garbage truck; and observed the State Trooper conduct field sobriety tests. Based on his observations, Mr. Person concluded the Defendant was intoxicated, further stating: "It is my opinion [the Defendant] was impaired."

Mr. Oscar Maynez testified that when he first ran down the embankment where the minivan had come to rest after being hit, he "started hearing little kids crying, begging for help . . . crying for their mom and dad." He then saw the Defendant get out of his truck and "take a big ol' chug of beer." After the Defendant

had taken this "long-ass chug" of Milwaukee's Best beer, he threw the empty can into the bushes. Mr. Oscar Maynez concluded that "it was obvious that [the Defendant] was drunk," stating that he smelled alcohol on the Defendant, and the Defendant "stumbled," and could not stand up straight.

Mr. Manuel Maynez, the brother of Oscar Maynez, testified that he was in the sleeper of the truck his brother was driving when the accident occurred. He exited the truck and arrived at the accident scene in time to see the Defendant climb out of his over-turned garbage truck and throw a beer can into the bushes. Mr. Manuel Maynez also stated that the Defendant had alcohol on his breath, but when asked, the Defendant denied he had been drinking. Mr. Manuel Maynez further described the Defendant moments after the accident as "stumbling" and "mumbling." At one point, he was forced to grab the Defendant and pull him to safety after the Defendant wandered out over the fog line and into a lane with on-coming traffic. Mr. Manuel Maynez concluded that the Defendant "was not sober."

Mr. Faulkenham also testified that he observed the Defendant shortly after the accident "walk with a limp or a slight stagger," and found several beer cans on the ground near the over-turned truck, which he gathered together, placed in the cardboard beer case he found, and handed to the first State Trooper to arrive at the scene. He stated that of the eight to ten beer cans he found, most were full, some were empty, and some were damaged. Mr. Faulkenham also testified that he smelled alcohol on the Defendant.

Mr. Mark Pierce, an EMS paramedic, testified that he just happened to be driving on I-40 that night and arrived on the scene shortly after the accident occurred. He rushed to the minivan, which he described as "severely damaged." He described what he found inside as "seven patients total, and four appeared to have expired. The three female patients that were in the rear seat of the vehicle were all-appeared to be very badly injured." He determined the injuries to the three live victims were "life threatening," and immediately called for helicopter transport. Mr. Stewart Fuqua of the Tennessee City Volunteer Fire Department testified that he assisted in the extraction of the victims from the wreckage. Because of the extensive damage, he was forced to remove a passenger side door in order to remove the bodies of the two small boys who were sitting in the middle seat. Next, he removed the seat itself, and then was finally able to access the three living victims in the back seat, who were placed on two life flight helicopters. Mr. Fuqua also assisted in removing the two deceased adults from the front seats.

Trooper Mark Blasco of the Tennessee Highway Patrol was the first law enforcement officer to arrive on the scene. Trooper Blasco testified that he smelled alcohol on the Defendant's breath and asked if he had been drinking, to which the Defendant responded that he had "a beer" in Chattanooga and pointed in the opposite

direction from Chattanooga. Trooper Blasco administered several field sobriety tests, including the finger-to-nose, one-leg-stand, and walk-and-turn tests. Trooper Blasco testified that the Defendant performed "poorly" on the finger-to-nose test, could not perform the one-leg-stand, and missed several steps on the walk-and-turn test. Trooper Blasco stated that it "was obvious [the Defendant] was greatly impaired," and he placed him under arrest for DUI. The Trooper also stated that he found a cardboard Milwaukee's Best beer case inside the garbage truck, which contained four unopened and cold cans of beer. He also found two nearly empty beer cans inside the cab of the over-turned truck. Officer Blasco stated that he placed the cardboard case and beer cans on the hood of his patrol car, but the rotor-wash from the life flight helicopters blew the cans off his car, and when he returned he "made a mistake and then threw them away."

Trooper Jacob Blackwell of the Tennessee Highway Patrol testified that he retrieved the Defendant from the back of Trooper Blasco's patrol car and transported him to the hospital to have a blood sample drawn sometime between 11:00 p.m. and 1:00 a.m. Trooper Blackwell stated that he smelled alcohol on the Defendant, and the Defendant stated to him that he had "a few" beers. Trooper Blackwell further testified that the Defendant signed an implied consent form before the blood sample was drawn, and that he personally delivered the Defendant's blood sample to the TBI crime lab. Special Agent Jerry Dickey, an investigator with the Tennessee Highway Patrol, took the Defendant's statement and attempted to interview him after the blood sample was drawn. However, when asked if he had been drinking, the Defendant stated: "I don't want to answer that." In the Defendant's official statement for the Highway Patrol accident report, he wrote: "all I remember is the vehicle started swerving" and then "flipped over."

Troopers Randy Robinson and Allan Brenneis, both of the Tennessee Highway Patrol Critical Incident Response Team, were certified as experts in accident reconstruction and testified that the the [sic] evidence they collected showed no signs of a defect in the road or tire blow-out. Rather, the evidence, primarily the "yaw marks" left on the road by the garbage truck, indicate that it was going approximately sixty-nine miles per hour when erratic steering caused a weight shift; the truck started to slide toward the outside lane; then over-steering caused another weight shift; the truck then slid in the other direction and continued to travel across the median and into on-coming traffic. Trooper Robinson also testified that there was no sign of any braking.

Mr. Roger Edwards, the general manager of a Pilot Travel Center located just off the interstate highway near Rising Fawn, Georgia, testified that he is in charge of the store's video surveillance tapes. The State played a tape for the jury purporting to show the Defendant making a purchase of a six-pack. Mr. Edwards testified that the tape contained footage of his store, taken at 5:30 p.m. on July 19, 2002, and that

the only products his store sold bound by plastic into a six-pack were cans of beer. Trooper Jerry Dickey identified the customer in the video as the Defendant.

Special Agent John Harrison, a Forensic Scientist with the TBI, was certified as an expert in toxicology and retrograde extrapolation. Agent Harrison testified that the Blood Alcohol Content (BAC) of the Defendant's sample submitted to his lab was 0.0699%. Using retrograde extrapolation, Agent Harrison testified that, in his opinion, at the time of the accident, approximately two to two and a half hours prior to when the Defendant's blood was drawn, the Defendant's BAC would have been approximately 0.08%. Agent Harrison further testified that some individuals can be impaired with as little as a 0.04% BAC. On cross-examination, Agent Harrison admitted that a variety of factors could effect the "average" upon which he based his calculations.

Laura Hanlein, one of the surviving victims, testified that she was sleeping in the back seat of her family's minivan when she awoke to the violent accident. As a result of the accident, the ligaments in her neck and left knee were torn; she lost seven inches of her small intestine; she broke a finger and both of her wrists; and she suffered brain and lung injuries. She was ten years old at the time of the accident. Brandi Knowles, the mother of victim Bayli Hanlein, testified that Bayli suffered a broken leg which required pins; her colon was perforated; and she endured multiple surgeries and extensive therapy and counseling. Bayli was seven at the time of the accident. James Duck, father of victim Jessica Duck, testified that Jessica broke both of her legs requiring plates and screws; broke her right arm requiring screws and rods; injured her lungs; suffered from internal bleeding; and endured multiple surgeries. Jessica was eleven at the time of the accident. The death certificates of the four victims killed in the accident, Bradley Duck, Andrew Duck, Janet Hanlein, and Joseph Hanlein, Jr. were read into the record.

The Defense offered no evidence, but made a motion for judgment of acquittal, which was denied. The jury found the Defendant guilty of four counts of vehicular homicide, three counts of vehicular assault, and DUI. Pursuant to the bifurcated trial requirements, see Tenn. Code Ann. § 39-13-218(c), the jury was presented with evidence that the Defendant had a record of prior driving while intoxicated offenses. The jury then found the Defendant guilty of aggravated vehicular homicide and DUI, third offense. The trial court imposed consecutive sentences of twenty-five years for each aggravated vehicular homicide conviction, four years for each vehicular assault conviction, and eleven months, twenty-nine days and a $10,000 fine for the DUI third conviction. The Defendant timely filed a motion for a new trial, which was denied.

State v. Thomas W. Cothran, No. M2005-00559-CCA-R3-CD, 2005 WL 3199275, at *1-5 (Tenn. Crim. App., at Nashville, Nov. 29, 2005) (footnotes omitted).

**Post-Conviction Hearing**.  At the post-conviction hearing, the petitioner's half-brother, Steven Gray, testified that he helped the petitioner obtain legal representation.  Gray, who is a criminal defense attorney, did not serve as the petitioner's counsel; however, he spent considerable time reviewing the petitioner's case.  Gray testified that he hired David Heno to investigate the collision.  Heno did not testify at trial or at the post-conviction hearing.  Gray said Heno had experience in accident reconstruction through NASCAR; however, Gray acknowledged that Heno did not have a degree in accident reconstruction.  Gray claimed Heno was willing to testify that the conclusions of his investigation differed from those of the Critical Incident Response Team.  Gray also testified that he provided trial counsel ("counsel") with information about alcohol retrograde extrapolation, which counsel did not use at trial.

The petitioner testified that he had been a professional truck driver for most of his life.  He has no recollection of the collision other than "three bumps" and "mashing the seatbelt."  During trial, the petitioner said he told counsel to question the State's witness, Oscar Maynez, about whether he had a driver's license.  The petitioner also told counsel to question Maynez about the use of his "jake brakes."  Counsel did not question Maynez about either matter.  The petitioner testified that counsel had very limited knowledge of trucking.  The petitioner said the elements of the charged offenses were not explained to him, and that he was not informed that he could testify at his sentencing hearing.

Counsel testified that before representing the petitioner, he had tried only one homicide case.  Counsel's defense theory was that the collision was not caused by the petitioner's intoxication, but by Oscar Maynez initially striking the petitioner's trailer.  Counsel said he did not interview Maynez prior to trial.  In preparing for trial, counsel relied entirely on the discovery he received from the State.  He could not recall filing a motion for discovery.  Counsel did not thoroughly examine the scene of the collision, or personally inspect the trailer that the petitioner initially struck.  After Maynez testified, counsel did not recall receiving a letter which said Maynez did not have a valid driver's license.

Counsel testified that he did not pursue the testimony of Heno after learning he had a prior conviction.  Counsel said he hired an accident reconstruction expert to investigate the collision; however, the expert's conclusions were consistent with those of the Critical Incident Response Team, and therefore he did not have the expert testify.  Counsel said he did not attempt to contact an alcohol retrograde expert, and he did not investigate the chain of custody for the petitioner's blood sample.  Counsel put on no proof at trial or at the sentencing hearing.

The post-conviction court determined that counsel's performance was not deficient and did not prejudice the petitioner.  First, it found that counsel's investigation of the case was reasonable.  It stated that counsel had "open file discovery," which gave him access to all of the State's evidence.  The court also determined that the petitioner was not prejudiced by counsel's failure to interview Oscar Maynez because Maynez was just one of several witnesses to testify about the collision.

Next, the court found that counsel's performance was not deficient even though no experts testified for the defense. The court noted that counsel contacted an expert in accident reconstruction; however, the expert's conclusions were not beneficial to the petitioner. The court said counsel's decision not to have Heno testify was reasonable because Heno had been convicted of driving under the influence. Additionally, Heno might not have qualified as an expert witness. The court acknowledged that neither Heno nor an expert in alcohol retrograde testified at the post-conviction hearing. The court also found that counsel's failure to object to "inflammatory and improper" comments made by Oscar Maynez was not improper. The court stated that counsel's conduct during closing argument was "perhaps the most persuasive of the petitioner's claims;" however, it found that counsel "was able to pull it together and present a sufficient closing argument in the face of overwhelming evidence . . ."

## ANALYSIS

**Standard of Review**. Post-conviction relief is only warranted when a petitioner establishes that his or her conviction is void or voidable because of an abridgement of a constitutional right. T.C.A. § 40-30-103 (2006). Our supreme court has held:

> A post-conviction court's findings of fact are conclusive on appeal unless the evidence preponderates otherwise. When reviewing factual issues, the appellate court will not re-weigh or re-evaluate the evidence; moreover, factual questions involving the credibility of witnesses or the weight of their testimony are matters for the trial court to resolve. The appellate court's review of a legal issue, or of a mixed question of law or fact such as a claim of ineffective assistance of counsel, is de novo with no presumption of correctness.

Vaughn v. State, 202 S.W.3d 106, 115 (Tenn. 2006) (internal quotations and citations omitted). The petitioner bears the burden of proving factual allegations in the petition for post-conviction relief by clear and convincing evidence. Id.; see also T.C.A. § 40-30-110(f) (2006). Evidence is clear and convincing when there is no serious or substantial doubt about the accuracy of the conclusions drawn from it. Hicks v. State, 983 S.W.2d 240, 245 (Tenn. Crim. App. 1998).

Vaughn further repeated well-settled principles applicable to claims of ineffective assistance of counsel:

> The right of a person accused of a crime to representation by counsel is guaranteed by both the Sixth Amendment to the United States Constitution and article I, section 9, of the Tennessee Constitution. Both the United States Supreme Court and this Court have recognized that this right to representation encompasses the right to 'reasonably effective' assistance, that is, within the range of competence demanded of attorneys in criminal cases.

Vaughn, 202 S.W.3d at 116 (internal citation and quotation omitted).

In order to prevail on an ineffective assistance of counsel claim, the petitioner must establish that (1) his lawyer's performance was deficient and (2) the deficient performance prejudiced the defense. Id. (citing Strickland v. Washington, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064 (1984) and Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975)). "[F]ailure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim[, and] a court need not address the components in any particular order or even address both if the [petitioner] makes an insufficient showing of one component." Goad v. State, 938 S.W.2d 363, 370 (Tenn. 1996).

A petitioner successfully demonstrates deficient performance when the clear and convincing evidence proves that his attorney's conduct fell below an objective standard of "reasonableness under prevailing professional norms." Id. (citing Strickland, 466 U.S. at 688, 104 S. Ct. at 2065). Prejudice arising therefrom is demonstrated once the petitioner establishes "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. "A 'reasonable probability is a probability sufficient to undermine confidence in the outcome.'" Id. (quoting Strickland, 466 U.S. at 694, 104 S. Ct. at 2068).

**I. Ineffective Assistance of Counsel**. The petitioner claims the post-conviction court erred in denying his petition for post-conviction relief. He argues that counsel failed to: (1) adequately investigate a State's witness; (2) obtain the testimony of expert witnesses in accident reconstruction and alcohol retrograde extrapolation; (3) advise the petitioner not to make incriminating statements in a collateral civil proceeding; (4) object to inflammatory comments made by a State's witness; and (5) perform an effective closing argument. The petitioner also claims the cumulative effect of these alleged errors denied the petitioner the effective assistance of counsel.

The petitioner asserts that counsel "conducted no investigation at all" even though Maynez was central to the petitioner's defense theory. First, the petitioner claims counsel was ineffective because he failed to adequately investigate a State's witness, Oscar Maynez. The State argues the petitioner cannot establish deficient performance or prejudice because Maynez did not testify at the post-conviction hearing. The State also contends the post-conviction court properly found that prior investigation of Maynez would not have affected the outcome of the trial.

We agree with the post-conviction court that the petitioner cannot establish deficient performance or prejudice. In Black v. State, this court held:

> When a petitioner contends that trial counsel failed to discover, interview, or present witnesses in support of his defense, these witnesses should be presented by the petitioner at the evidentiary hearing. As a general rule, this is the only way the petitioner can establish that (a) a material witness existed and the witness could have been discovered but for counsel's neglect in his investigation of the case, (b) a known witness was not interviewed, (c) the failure to discover or interview a witness inured to his prejudice, or (d) the failure to have a known witness present or call the witness

to the stand resulted in the denial of critical evidence which inured to the prejudice of the petitioner.

Black v. State, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990). Here, the petitioner contends an investigation of Maynez would have produced evidence that Maynez was not a credible witness and possibly caused the collision. However, Maynez did not testify at the post-conviction hearing, and therefore we will not speculate about whether an investigation would have produced such evidence. Id. Additionally, several other witnesses testified about how the collision occurred. Donald Person testified that he saw the petitioner drive erratically before side-swiping the trailer driven by Faulkenham. Faulkenham testified that the petitioner struck his trailer from the side. Neither witness said Maynez was involved in the collision. The record supports the post-conviction court's determination that further investigation of Maynez would not have affected the outcome of the trial. The petitioner is not entitled to relief on this issue.

Next, the petitioner argues that counsel's performance was ineffective because he failed to obtain the testimony of an expert in accident reconstruction or alcohol retrograde extrapolation. The State claims that the petitioner cannot show deficient performance or prejudice because he did not have an expert in either subject testify at the post-conviction hearing. We agree with the State. Under Black, the petitioner needed to present the testimony of all potential expert witnesses at the hearing in order to establish that "a material witness existed and the witness could have been discovered but for counsel's neglect in his investigation of the case." Id. Here, no expert witnesses testified at the post-conviction hearing. Again, we will not speculate about what the testimony of an expert in accident reconstruction or alcohol retrograde extrapolation might have been. Id. We also reject the petitioner's claim that this case is comparable to Tavarus Williams v. State, in which this court made an exception to this court's holding in Black. No. 02C01-9711-CR00423, 1998 WL 742348, at *7 (Tenn. Crim. App., at Jackson, Oct. 23, 1998). Tavarus Williams is distinguishable because the petitioner in this case presented no evidence of what the testimony of the expert witnesses would have been. Id. We agree with the post-conviction court that an exception to our holding in Black is not warranted.

The petitioner also contends counsel was ineffective because he failed to advise the petitioner not to make incriminating statements in a collateral civil proceeding. We decline to consider this issue because it was not included in the petition for post-conviction relief. See T.C.A. § 40-30-106(d) ("The petition must contain a clear and specific statement of all grounds upon which relief is sought, including full disclosure of the factual basis of those grounds."); see also Tennessee Supreme Court Rule 28, section 5(E) ("The petition shall contain . . . (3) each and every error that petitioner asserts as a ground for relief, including a description of how petitioner was prejudiced by the error(s)."). Accordingly, we conclude the petitioner is not entitled to relief on this issue because he failed to comply with the rules governing post-conviction relief.

Next, the petitioner claims counsel was ineffective because he did not object to statements made by Oscar Maynez at trial. Maynez testified that after the collision occurred, he told two bystanders, "'You know, this asshole right here just hit a family just because he wants to be drinking,

he wants to be drinking and driving in a big, you know, garbage truck.'" The petitioner argues that these statements were irrelevant and unfairly prejudicial. We agree with the petitioner that counsel should have raised an objection based on Tennessee Rule of Evidence 403. We cannot conclude, however, that the petitioner was prejudiced by Maynez's statements. Maynez already testified that he watched the petitioner drive erratically, before bumping a tractor and colliding with the victim's vehicle. Maynez also testified that the petitioner was obviously intoxicated and took "a big ol' chug of beer" immediately after the collision. The statements at issue expressed Maynez's personal reaction to his prior admissible testimony. While Maynez's inflammatory comments warranted an objection, they certainly did not affect the outcome of the trial. The petitioner is not entitled to relief on this issue.

The petitioner also argues that he received ineffective assistance of counsel based on counsel's closing argument. Counsel abruptly paused on two different occasions during his closing argument. After the first pause, he stated, "You'll have to excuse me. This is frustrating for me, this is a big case and my mind is swirling, so if I could collect myself for a second." Later, after the second pause, counsel stated, "I do apologize. It's not my habit to be taken off-guard like this. This is a difficult case." The petitioner argues that counsel's closing argument showed he was overwhelmed by the case and was unable to adequately represent the petitioner. The State contends the post-conviction court did not err in finding that the closing argument was not deficient or prejudicial.

The post-conviction court found that counsel, despite becoming "temporarily distracted," was able to "pull it together and present a sufficient closing argument in the face of overwhelming evidence against the Petitioner." Our review of the court's finding is somewhat limited, as the record does not indicate the length or manner of counsel's pauses. The record shows that counsel became flustered during his closing argument, and that he expressed his frustration with the case, which he said was difficult. This evidence alone does not preponderate against the finding of the post-conviction court. Additionally, we cannot conclude the petitioner was prejudiced by counsel's closing argument. The trial court stated, "[T]his Court is hard pressed to envision a case wherein the proof would be more beyond a reasonable doubt than this case." We agree with the post-conviction court that counsel's closing argument did not affect the outcome of the trial. Therefore, the petitioner is denied relief on this issue.

Lastly, the petitioner claims the cumulative effect of counsel's alleged errors denied him effective assistance of counsel. The State argues that the petitioner failed to establish deficient performance or prejudice for any of the alleged errors. Upon review, we hold the petitioner was not prejudiced by counsel's representation. Accordingly, the petitioner is not entitled to relief.

**Conclusion**. Based on the foregoing, the judgment of the post-conviction court is affirmed.

_____
CAMILLE R. McMULLEN, JUDGE