# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs January 5, 2010

## COREY LYNN CLARK v. STATE OF TENNESSEE

**Direct Appeal from the Circuit Court for Gibson County**
**No. 7286      Clayburn L. Peeples, Judge**

---

**No. W2009-01610-CCA-R3-PC  - Filed March 12, 2010**

---

The Petitioner, Corey Lynn Clark, appeals the Gibson County Circuit Court's summary dismissal of his petition for post-conviction relief. On appeal, the Petitioner contends that the post-conviction court violated his due process rights by summarily dismissing his petition without following the requirements of the Post-Conviction Procedure Act as stated in Tennessee Code Annotated section 40-30-101, et. seq. Upon review, we reverse and remand for further proceedings in accordance with the Post-Conviction Procedure Act.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court**
**Reversed and Remanded**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which ALAN E. GLENN and J. C. MCLIN, JJ., joined.

Corey Lynn Clark, Pro Se, Whiteville, Tennessee.

Robert E. Cooper, Jr., Attorney General and Reporter; Cameron L. Hyder, Assistant Attorney General; and Garry G. Brown, District Attorney General, for the Appellee, State of Tennessee.

## OPINION

The Petitioner was convicted of second degree murder, a Class A felony, and was sentenced to serve twenty years at 100 percent in the Tennessee Department of Correction. See State v. Cory Lyn Clark, No. W2005-01020-CCA-R3-CD, 2006 WL 2191255, at *1 (Tenn. Crim. App., at Jackson, Aug. 2, 2006), perm. to appeal denied (Tenn. Dec. 18, 2006). The Petitioner's conviction was affirmed on direct appeal. See id.

The Petitioner then filed a petition for post-conviction relief, and the post-conviction court granted relief by "voiding" his December 20, 2004 conviction for second degree

murder and his twenty-year sentence.[1] On September 22, 2008, the Petitioner entered a guilty plea to the same offense, second degree murder, and received a fifteen-year sentence at 100 percent pursuant to the plea agreement. On May 7, 2009, the Petitioner filed a pro se petition for post-conviction relief on his conviction pursuant to his plea agreement, claiming, among other things, that: (1) his guilty plea was involuntary; (2) the State failed to disclose evidence in violation of Brady v. Maryland, 373 U.S. 83, 83 S. Ct. 1194 (1963); and (3) he received ineffective assistance of counsel because counsel failed to inform him of the sentence that he would serve in confinement pursuant to his plea agreement. On July 10, 2009, the post-conviction court summarily dismissed the petition by written order without stating any reasons for its dismissal other than "for good cause shown." On July 22, 2009, the Petitioner filed a timely notice of appeal.

In the opinion on direct appeal, this court provided a summary of the underlying facts in this case:

> The defendant shot and killed Nakia Partee, the mother of his child, during an altercation in his bedroom. The defendant claimed that he shot the victim in self-defense after the victim allegedly picked up a knife and stabbed him.
>
> At the trial, Lieutenant Bill Baker, Assistant Chief of Police for Humboldt, testified that he investigated the death of the victim. He was off-duty when he learned of the shooting and of the presence of the defendant with a stab wound at the police department. He said that when he arrived, Sergeant Tony Williams had secured the scene and Officer Mike Lewis had begun an investigation. Additionally, Melvin Stewart, the defendant's uncle, and Louetta Whitehorn, the defendant's grandmother, were present. He testified that they found the victim's body in the defendant's bedroom between the bed and the dresser and found the knife near the body, next to the dresser. Additionally, they discovered a bullet casing beneath the victim's chest, twelve

---

[1]The record is unclear regarding the post-conviction court's grant of relief on the Petitioner's first petition. Neither a copy of the Petitioner's first post-conviction petition nor the court's written order granting post-conviction relief is included in the record.

The only information regarding the post-conviction court's grant of relief on the first petition is included in the October 15, 2008 judgment form pursuant to the guilty plea agreement under the Special Conditions section, which states: "By agreement with the State, the court granted [the Petitioner's post-conviction petition], voiding his 12/20/04 conviction. [The Petitioner] shall receive credit for time spent in TDOC since 12/20/04."

inches from the right corner of the bed. The victim had gunshot wounds to the left cheek and to the top right-hand side of the back of her head. He said they sent the body for an autopsy. He also testified that he did not recall seeing blood on the victim's hands. Lieutenant Baker said the defendant came to the police department after the incident. Officer Lewis later read the defendant his Miranda rights and took the defendant's statement in the presence of Lieutenant Baker at approximately 11:47 p.m. The recorded statement was played for the jury at trial, and the jurors were furnished with a transcription to follow as the tape played. No objection was raised to either the playing of the tape or the transcript. Lieutenant Baker testified that the defendant indicated that he was standing with his arms extended when he fired at the victim. He said that the defendant indicated that he placed the weapon under some shrubbery at the police station before entering, and officers later found the gun in that location. He said that the TBI ballistics analysis indicated that the bullet and casing were discharged from the recovered weapon. He testified that the defendant's only wound was to his arm and that he had sustained no apparent defensive wounds. The knife was submitted for analysis but they were unable to develop any fingerprints from the knife. He further testified that a second statement was taken from the defendant a few days later, but no tape recording was available at trial. A transcription of the second statement was read aloud to the jury. He noted that during the second statement, the defendant attempted to explain why the victim was shot in the back of the head as opposed to the face, as he had originally stated.

On cross-examination, Lieutenant Baker testified that Reserve Officer Kenny Perry discovered the weapon and turned it over to Officer Lewis. At that time, there was a hair on the muzzle of the weapon but it was lost between the recovery of the weapon and the trial. He acknowledged that the evidence was compromised and that they "should have the hair, but [ ]do not." He further acknowledged that the tape recording of the second statement was lost. He reiterated that no fingerprints were found on the knife. He said that the gun was fired at close range and that he could not definitively say that the victim, in a struggle with the defendant, did not turn at the moment that the shot was fired. He said that different questions were asked in the first and second interviews. He said that they asked the location of the gun in the first interview and that the defendant said he did not want to walk into the police department with a gun so he threw it in the shrubbery. He said that the defendant was forthright about the location of the weapon and was cooperative throughout the interviews.

On redirect examination, Lieutenant Baker testified that the transcript of the second interview accurately reflected the contents of the interview. He said that people do not always leave fingerprints. He also said that if the murder weapon were held close to a foreign object, it might become trapped between the slide and the barrel "before it cycles." He noted that for the defendant's arms to be outstretched, as he admitted they were, the victim would have to have been at least an arm's length away from him. He also said that if she had turned away, she would not have posed a threat to him. On re-cross, he testified that no prints were taken from the gun. He agreed that there were things that "could've [been] done differently" and admitted that the taped statement should not have been lost.

The next witness to testify was Officer Mike Lewis. Officer Lewis testified that he is currently employed as a patrol officer with the Collierville Police Department but was formerly employed as an investigator with the Humboldt Police Department. He said that he was the investigator in the death of the victim on October 19, 2002. He said that he was working at the police department when the defendant walked in and stated that he had shot someone at 115 Ethridge Street. The defendant said that his girlfriend had stabbed him, and Officer Lewis testified that he observed only the stab wound to the defendant's left arm. He testified that he responded to the scene and found the victim lying dead on the floor in the back bedroom. He said that Mr. Stewart and Ms. Whitehorn were in the front of the house when he arrived on the scene. He said that the defendant stated during an interview that he retrieved the weapon from a top right drawer in the bedroom. He further said that when they arrived, he noted that the dresser drawer was closed. He said that the drawer "was stuffed with quite a bit of stuff, papers, et cetera" and that he was not able to open the drawer with one hand because it was so full.

On cross-examination, Officer Lewis testified that he collected the evidence and took a recorded statement from the defendant. He said that the defendant was cooperative. He said that he did not ask the defendant if he closed the drawer and that he did not take a statement from anyone else regarding the drawer. He said he also collected the knife and took photos of the crime scene. He was unable to lift prints from the knife and did not analyze the gun. He said that he conducted a second interview to ask further questions and that he recorded both statements. He acknowledged that the tape of the second interview was relevant, that it was now unavailable, and that this was the first time that he had lost a tape. He said that he was not involved in

the interview with Melvin Stewart. He also said that he did not take pictures or ascertain the extent of the defendant's injuries.

On redirect examination, he testified that during the first interview, the defendant stated that the victim was facing him when he shot her. Officer Lewis further testified that he subsequently learned that the victim had been shot in the back of the head. He again testified that he did not ask the defendant if he shut the dresser drawer, but the defendant did not indicate that he shut the drawer in relaying his version of the time line of events as they occurred. He said the hospital treated and released the defendant. On re-cross, he testified that he did not accompany the defendant to the hospital.

The next witness was Sergeant Tony Williams of the Humboldt Police Department. He testified that he was the first officer to respond to the crime scene. He said that he found four subjects in front of the house when he arrived and that they indicated that the victim was in the bedroom. He said that the victim had a bleeding head wound. He called the paramedics who verified that the victim was dead.

Next, Reserve Officer Kenny Perry of the Humboldt Police Department testified that he went to assist Sergeant Williams in responding to the crime scene. He said that they secured the scene and the vehicle that the defendant drove to the station. He testified that he discovered the weapon underneath some shrubbery outside the station, approximately eight to ten-feet from the vehicle.

Next, Melvin Stewart, Jr., testified that he lives at 115 Etheridge and that he is the defendant's uncle. He was at the house on the night that the victim was killed. He said he saw the defendant, the victim, and their child in the yard between 7:00 and 7:30 p.m., but he did not overhear their conversation. He testified that the defendant brought the child into the home, that the victim returned about half an hour later, and that she "didn't look real happy." Stewart said that the victim went into the bedroom, and he heard "a pop." Then the defendant came out of the bedroom, said the victim had cut him, and told him to "see about the baby." He said that the defendant left but did not say where he was going. He also said that he never saw a gun. He went into the bedroom and got the baby. He said that his mother, Louetta Whitehorn, arrived at the home and that the police arrived shortly thereafter. He did not know what the defendant did after going outside. He said that his

mother went into the bedroom but that she did not touch or move anything. He said he did not hear the defendant cry out in pain before the "pop."

On cross-examination, he again said the defendant brought the child into the house and that neither the defendant nor the victim "seem[ed] too happy." He said that he saw the victim on the floor after he went in to get the child and that he did not believe the child realized what had happened. He did not remember if the defendant came back to get keys but he heard the car leave. He had never heard the defendant and victim arguing prior to this incident. He said that the defendant took care of the child "every time that [the victim] needed him to." He said that the child has cerebral palsy. He did not hear the victim say why she came back the second time.

On redirect examination, he estimated that the defendant kept the child seven or eight times between the time he and the victim ended their relationship in April and the time of the victim's death. He did not recall giving the police a statement after the incident. He said that he "may have" told the police that he was "half-asleep" and dozed off when the victim and defendant were in the bedroom.

The next witness to testify was Christie Ball. She testified that she was at the victim's apartment on the day that she died. She arrived around 6:00 p.m. to accompany the victim to Jackson, Tennessee, to attend Homecoming festivities at Lane College. She said the defendant came to the apartment shortly after she arrived. She heard the victim repeatedly tell the defendant to leave, and she believed that he was bringing their child back to the victim. She said that the victim pushed him out of the door and that he hit the door and left. She said he left the child and took the victim's cellular phone. She said that the victim left to retrieve her cellular phone at the defendant's house and to take the child to her mother's house in Milan.

Next, Denetta Bryson testified that she was a close friend to the victim. She said that the relationship between the victim and defendant ended approximately seven months before the victim's death. She recalled that in May 2002, she was with the victim when the defendant approached her and they began arguing. She said the defendant told the victim that "if he couldn't have her that, you know, he would kill her." The victim also let her listen to phone messages left by the defendant approximately one week before her death in which he expressed anger that she was going out, cursed at her, and threatened to kill her. The defendant called the victim more than thirty times

in a forty-five minute span in which she heard the defendant "yelling, screaming, and cursing." During cross-examination, she testified that she spoke to the police about the phone conversations and messages. She said she did not know if the officers listened to the messages or if they obtained the victim's cellular phone records.

Next, Lynn Bailey testified that she was a cousin of the victim but did not know the defendant. She said that after the defendant and the victim ended their relationship, the victim tried to develop a social life. Bailey testified that she had listened to approximately nine messages on the victim's cellular phone, one of which indicated that if the defendant could not have the victim, no one could.

Next, Tangi Bailey testified that she was a cousin of the victim and that they worked together for two and a half to three years. She said that the defendant and victim had ended their relationship six months prior to the victim's death and that they had argued from that time until her death. She said that she heard a voice mail message left by the defendant on the victim's phone in which he implied that the victim was not answering the phone because she was having sex with another man. She also stated that the defendant would show up at the victim's place of work unexpectedly after their breakup.

During cross-examination, Ms. Bailey admitted that there was never an altercation at the victim's job site. She claimed that the victim would ask her if she had seen the defendant out with other women and that she responded that she had seen him out on several occasions. On redirect, she said that the victim's mother usually kept the child when the victim went out and that the defendant only kept him overnight "twice or so."

Next, Lieutenant Baker was recalled and testified that the defendant stated in his interviews that he had left messages on the victim's cellular phone regarding their son but denied that he threatened to kill her or himself.

The next witness to testify was Dr. Teresa Campbell, assistant medical examiner to the regional forensic center in Memphis. She testified that her autopsy on the victim determined that the cause of death was a contact gunshot wound to the head. She said that there was no drugs or alcohol in the victim's system at the time of death. She said that the entrance wound was the top right of the back of the head and that the exit wound was in the left cheek. She

testified that a "contact wound" indicated that the muzzle of the gun was against the skin at the time the gun was fired. She said that the injuries were consistent with a hard contact wound, which indicated pressure applied to the skin at the time of discharge. On cross-examination, she said that the victim had no injuries other than the gunshot wounds and that she could not determine the position of the defendant or the victim from the injuries.

The State rested its case, and the defendant presented a motion for a judgment of acquittal, which was overruled. The defense began their proof by calling an acquaintance of the defendant.

Andrea Vinson testified that she had a six-year relationship with the defendant. She said that during her relationship with the defendant, the victim followed them in a vehicle at a high rate of speed, forcing the defendant to stop and speak with the victim. She said that they argued on a second occasion outside a Long John Silver's restaurant.

On cross-examination, she testified that the defendant dated both women at the same time. She said that the defendant called her on the night of the victim's death. She further stated that she was unable to hear the conversation between the defendant and victim at the Long John Silver's. On redirect, she stated that she told the truth as best as she remembers.

Next, the defendant testified on his own behalf. He said that he is twenty-eight years old and that he and the victim have one child, Jacorey. He said that he and the victim broke up and got back together often. He acknowledged that he was seeing Andrea Vinson and the victim at the same time. He said that the day before she died, he and the victim ate lunch at Long John Silver's. He said the victim dropped their child off at 11:00 a.m. on the day of her death. He cut the child's hair, gave him a bath, and fed him. He then took the child to his grandmother's house and borrowed her van. He said that he went to get gas and to tell the victim he was going to take the child to Jackson.

When he arrived at the victim's apartment, Christie Ball let him in because the victim was in the bathroom. He said that the victim accused him of trying to bring the child back and that she told him to get the child's belongings. He went out and got the car seat and bag. He said she continued fussing at him and pushed him into the entertainment center. He said that she kicked the door and hit him in the leg. He said she threw her cellular phone at

him, but it missed and went out the door. He retrieved the phone and looked through the numbers stored in it when he returned to his house. He said the victim came over to retrieve the phone. He said he began to walk down the street and, when he came close to the house, the victim arrived and they argued for a few more minutes. He then took the child into the house, and the victim drove away. He said he did not expect her to come back, but she returned in thirty to thirty-five minutes. He said that they began arguing and that she hit him in the head. He claimed that he pushed her into the dresser, where she grabbed a knife. They continued to scuffle, and the victim stabbed him in the arm. He said he then reached into the dresser and retrieved his handgun. He said the victim threatened to kill him, he got off the bed, and then pushed and shot the victim. He said that his intention was to shoot the victim but not to kill her. The defendant said he then walked out and told his uncle Marvin what had happened and told him to get the child. He said that he attempted to flag down a car but was unsuccessful and went back into the house, got the victim's keys, and drove her car to the police department. He threw the gun in the shrubbery and went inside. He claimed he was not trying to hide the gun, but he was nervous. Once inside, he told an officer that "[his] baby's mother stabbed [him] and [he] shot her." An ambulance took the defendant to the hospital for treatment. He said that after his treatment, he was returned to the jail where he gave a statement to the police of what had happened. He said that the dresser drawer was not hard to pull out and that he did not close the drawer. He said he recalled that in the second interview, the questioning officer was trying to get him to admit that his arm was fully extended, but he refused. He said that he did not make threatening phone calls to the victim. Finally, he stated that it took eight stitches to close his stab wound.

During cross-examination, the defendant testified that he shot the victim. He said that the only wound he received was a stab wound to his upper left biceps. He indicated that the knife penetrated approximately one inch into his arm through a long-sleeved cotton shirt. He was treated and released from the Humboldt Hospital Emergency Room. He claimed that the victim swiped him across the face "like a mugging." He denied that mugging is a sign of disrespect in the African-American community. He said that he was able to open the drawer with one hand. He said that the victim called him a "mother f-ker" among other things and that she had the knife in her right hand and "mugged" him with her left. He said that she stabbed him after he pushed her away twice. He said that he did not think the victim would stab him. He also said that he told the police that he did not know where he shot the victim. He also could not explain how the drawer got closed. He did not call for help

when the victim reached for the knife.  Finally, he said that at the time of the incident he and the victim were still carrying on a physical relationship.

The State then recalled Lieutenant Baker for rebuttal testimony.  On direct examination, he testified that the transcript to the defendant's second statement was substantially correct.  He said that he did not notice any blood on the bed when he inspected the crime scene.  On cross-examination, he said that he did not recall a previous instance where the tape of an interview was lost in a murder case.

Finally, the State called Sergeant Dennis Wright of the Humboldt Police Department. He said that he was present during Andrea Vinson's interview. He said that Ms. Vinson stated in the interview that the defendant kept his gun in a bag under the bed.

After deliberation, the jury returned a verdict of guilty for the charge of murder in the second degree.  The court then set a sentencing hearing for December 20, 2004, at which time the court sentenced the defendant to serve twenty-years in the Department of Correction as a violent offender.

Id. at *1-7.

## ANALYSIS

On appeal, the Petitioner argues that the post-conviction court violated his due process rights by summarily dismissing his petition without following the requirements of the Post-Conviction Procedure Act as specified in section 40-30-101, et. seq.  In response, the State acknowledges that the court erred in summarily dismissing the petition for post-conviction relief but claims that the error stemmed from the post-conviction court's failure to comply with section 40-30-106(b) (2006).

Post-conviction relief is only warranted when a petitioner establishes that his or her conviction is void or voidable because of an abridgement of a constitutional right.  T.C.A. § 40-30-103 (2006).  The Tennessee Supreme Court has held:

A post-conviction court's findings of fact are conclusive on appeal unless the evidence preponderates otherwise.  When reviewing factual issues, the appellate court will not re-weigh or re-evaluate the evidence; moreover, factual questions involving the credibility of witnesses or the weight of their testimony are matters for the trial court to resolve.  The appellate court's review of a

legal issue, or of a mixed question of law or fact such as a claim of ineffective assistance of counsel, is <u>de novo</u> with no presumption of correctness.

<u>Vaughn v. State</u>, 202 S.W.3d 106, 115 (Tenn. 2006) (internal quotation and citations omitted). "The petitioner bears the burden of proving factual allegations in the petition for post-conviction relief by clear and convincing evidence." <u>Id.</u> (citing T.C.A. § 40-30-110(f); <u>Wiley v. State</u>, 183 S.W.3d 317, 325 (Tenn. 2006)). Evidence is considered clear and convincing when there is no serious or substantial doubt about the accuracy of the conclusions drawn from it. <u>Hicks v. State</u>, 983 S.W.2d 240, 245 (Tenn. Crim. App. 1998) (citing <u>Hodges v. S.C. Toof & Co.</u>, 833 S.W.2d 896, 901, n.3 (Tenn. 1992)), <u>perm. to appeal denied</u> (Tenn. Nov. 2, 1998).

The Post-Conviction Procedure Act states that a petition for post-conviction relief "must contain a clear and specific statement of all grounds upon which relief is sought, including full disclosure of the factual basis of those grounds." T.C.A. § 40-30-106(d) (2006). Bare allegations that a constitutional right has been violated and mere conclusions of law will not be sufficient to warrant further proceedings. <u>See</u> <u>id.</u> Furthermore, the petitioner's "[f]ailure to state a factual basis for the grounds alleged shall result in immediate dismissal of the petition." <u>Id.</u> "If, however, the petition was filed pro se, the judge may enter an order stating that the petitioner must file an amended petition that complies with this section within fifteen (15) days or the petition will be dismissed." <u>Id.</u> In the event that an amended petition is incomplete, the court shall determine whether the petitioner is indigent and in need of counsel and may appoint counsel and enter a preliminary order if necessary to secure the filing of a complete petition. <u>Id.</u> § 40-30-106(e) (2006). If the facts alleged in the petition, taken as true, fail to show that the petitioner is entitled to relief or fail to show that the claims for relief have not been waived or previously determined, the post-conviction court shall dismiss the petition. <u>See</u> <u>id.</u> § 40-30-106(f) (2006). The order of dismissal shall set forth the post-conviction court's conclusions of law. <u>See</u> <u>id.</u> A post-conviction court shall enter an order or a preliminary order within thirty (30) days of the filing of the petition or amended petition. <u>See</u> <u>id.</u> § 40-30-106(a) (2006).

In <u>Burnett v. State</u>, the Tennessee Supreme Court outlined the process that a post-conviction court must follow in determining whether a petition for post-conviction relief should be dismissed without a hearing. 92 S.W.3d 403, 406 (Tenn. 2002). First, the court should review the petition to determine whether the petition asserts a colorable claim. <u>Id.</u> A colorable claim is defined as "'a claim that, if taken as true, in the light most favorable to the petitioner, would entitle petitioner to relief under the Post-Conviction Procedure Act.'" <u>Id.</u> (quoting Tenn. Sup. Ct. R. 28 § 2(H)). Accordingly, "[i]f the facts alleged, taken as true, fail to show that the petitioner is entitled to relief, or in other words, fail to state a colorable

claim, the petition shall be dismissed." Id. (citing T.C.A. § 40-30-206(f)). Second, the post-conviction court "may afford an indigent pro se petitioner the opportunity to have counsel appointed and to amend the petition, if necessary." Id. (citing T.C.A. § 40-30-207(b)(1)). The Burnett court summarized the last step in the process:

> In the final stage of the process preceding an evidentiary hearing, the trial court reviews the entire record, including the petition, the State's response, and any other files and records before it. If, on reviewing these documents, the court determines conclusively that the petitioner is not entitled to relief, the petition shall be dismissed. Tenn. Code Ann. § 40-30-209(a) (1997).

Id.

When determining whether a colorable claim has been presented, pro se petitions are held to a less rigid standard than formal pleadings drafted by attorneys. Allen v. State, 854 S.W.2d 873, 875 (Tenn. 1993) (citing Gable v. State, 836 S.W.2d 558, 559-60 (Tenn. 1992)). "If the availability of relief cannot be conclusively determined from a pro se petition and the accompanying records, the petitioner must be given the aid of counsel." Swanson v. State, 749 S.W.2d 731, 734 (Tenn. 1988) (citing T.C.A. §§ 40-30-104, -107, -115). However, "[w]here a petition conclusively shows that the petitioner is entitled to no relief, it is properly dismissed without the appointment of counsel and without an evidentiary hearing." Givens v. State, 702 S.W.2d 578, 580 (Tenn. Crim. App. 1985) (citing T.C.A. § 40-30-109), perm. to appeal denied (Tenn. Sept. 30, 1985).

The State contends that the post-conviction court summarily dismissed the petition without making the factual findings required by section 40-30-106(b), which provides:

> If it plainly appears from the face of the petition, any annexed exhibits or the prior proceedings in the case that the petition was not filed in the court of conviction or within the time set forth in the statute of limitations, or that a prior petition was filed attacking the conviction and was resolved on the merits, the judge shall enter an order dismissing the petition. The order shall state the reason for the dismissal and the facts requiring dismissal. If the petition is dismissed as untimely, the order shall state or the record shall reflect the date of conviction, whether an appeal was taken, the name of each court to which an appeal was taken, the date of the final action by each appellate court, and the date upon which the petition was filed.

T.C.A. § 40-30-106(b) (2006) (emphasis added). If the court's dismissal was related to issues concerning untimeliness or prior petitions resolved on the merits, then section 40-30-106(b) would be relevant. Unfortunately, the record on appeal provides no explanation for the post-conviction court's summary dismissal of the petition. Instead, based on the record, the post-conviction court appears to have summarily dismissed the petition after finding that the Petitioner would not have been successful following an evidentiary hearing. We note that "[t]he ultimate success or failure of a petitioner's claims is not a proper basis for dismissing a post-conviction petition without conducting an evidentiary hearing." William Alexander Cocke Stuart v. State, No. M2003-01387-CCA-R3-PC, 2004 WL 948390, at *3 (Tenn. Crim. App., at Nashville, May 4, 2004) (citing Roosevelt Malone v. State, No. E2002-00782-CCA-R3-PC, 2003 WL 21145488, at *2 (Tenn. Crim. App., at Knoxville, May 16, 2003); T.C.A. § 40-30-106(b) - (d)). Furthermore, there is no requirement that a petitioner prove his claims; he must only allege a colorable claim in his petition. See Shazel v. State, 966 S.W.2d 414, 415-16 (Tenn. 1998) ("There obviously is an important distinction between the right to seek relief in a post-conviction proceeding and the right to have relief in a post-conviction proceeding."). Usually, a petitioner is required to prove his claims by clear and convincing evidence at an evidentiary hearing. See William Alexander Cocke Stuart, 2004 WL 948390, at * 3. However, the Petitioner was not afforded a hearing on his claims in this case.

Here, the Petitioner alleged in his post-conviction petition that his guilty plea was involuntary, that he received ineffective assistance of counsel, and that the State failed to disclose evidence in violation of Brady v. Maryland, 373 U.S. 83, 83 S. Ct. 1194 (1963). Typically, all three of these claims are colorable grounds for post-conviction relief. The Petitioner claims that "it [was] impossible for [him] to have intelligently made the choice of accepting an Alford plea, when he was never informed by counsel of the actual consequences of accepting the plea." In addition, the Petitioner alleged that "had it not been for the improper advice (parole in 3 to 4 years) made by counsel (Exhibit I) then he would have insisted on going to trial." The Petitioner also attached a January 29, 2009 letter from defense counsel to his petition, in which counsel stated:

> As for the issue in your letter I did inform you that it would be a 15 year sentence at 100% which could be reduced to 85%. Based upon the time that you stated you had already served and had credit for plus your good time credit I told you that it sounded like you would be eligible for parole within 3 to 4 years.
>
> If this is no longer your understanding of what will happen and you wish to try and undo the plea you entered into you will likely have to file a

post-conviction relief against me alleging that I did not adequately explain your plea to you and that it was not knowingly and voluntarily entered into.

Accordingly, we conclude that the post-conviction court erred in summarily dismissing the Petitioner's claims. See Garry E. Collins v. State, No. 01C01-9603-CR-00120, 1997 WL 110016, at *1 (Tenn. Crim. App., at Nashville, Mar. 13, 1997).

Finally, the Petitioner argues that the judge failed to be fair and impartial because he "failed to follow the rules and statutes and issued the vague insufficient order dismissing [his] petition." Because of this alleged impartiality, the Petitioner requests that this court disqualify the judge from any future involvement in his case. First, we note that adverse rulings by a court are typically insufficient grounds to establish bias. Alley v. State, 882 S.W.2d 810, 821 (Tenn. Crim. App. 1994) (citing State v. Jimmy D. Dillingham, No. 03C01-9110-CR-319, 1993 WL 22155, at *5 (Tenn. Crim. App., at Knoxville, Feb. 3, 1993), perm. to appeal denied (Tenn. July 6, 1993)). Furthermore, "[r]ulings of a trial judge, even if erroneous, . . . do not, without more, justify disqualification." Id. (citing Riva Ridge Apartments v. Robert G. Fisher Co., 745 P.2d 1034, 1037 (Colo. App. 1987); Tackett v. Jones, 575 So.2d 1123, 1124 (Ala. Civ. App. 1990); Band v. Livonia Associates, 439 N.W.2d 285, 296 (Mich. Ct. App. 1989)). After reviewing the record, we conclude that the post-conviction court's actions in this case do not require disqualification. The Petitioner is not entitled to relief on this issue.

Accordingly, we reverse the judgment of the post-conviction court and remand the case for appointment of counsel and for an evidentiary hearing to consider the claims in the Petitioner's post-conviction petition.

## CONCLUSION

Upon review, we reverse the judgment of the post-conviction court and remand for further proceedings in accordance with the Post-Conviction Procedure Act.

_____
CAMILLE R. McMULLEN, JUDGE

-14-