IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs February 5, 2013

**EUGENE SPIVEY v. STATE OF TENNESSEE**

**Appeal from the Circuit Court for Crockett County**
**No. 3706C      Clayburn Peeples, Judge**

---

**No. W2012-01417-CCA-R3-PC  - Filed May 17, 2013**

---

The Petitioner, Eugene Spivey, appeals the Crockett County Circuit Court's denial of post-conviction relief from his conviction of second degree murder, a Class B felony.  In this appeal, the Petitioner argues that he received ineffective assistance of counsel and that he entered an involuntary and unknowing guilty plea.  In the alternative, he argues the State withheld exculpatory evidence in violation of Brady v. Maryland, 373 U.S. 83, 87, 83 S. Ct. 1194, 1196-97 (1963).  Upon review, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and ALAN E. GLENN, JJ., joined.

J. Daniel Rogers, Medina, Tennessee, for the Petitioner-Appellant, Eugene Spivey.

Robert E. Cooper, Jr., Attorney General and Reporter; David Findley, Senior Counsel; Garry E. Brown, District Attorney General; and Hillary Parham, Assistant District Attorney General, for the Appellee, State of Tennessee.

**OPINION**

After jury selection, the Petitioner, charged with first degree murder, entered a guilty plea to second degree murder.  He received a forty-year sentence at one hundred percent and the remaining charges were dismissed.[1]  At the plea hearing, the Petitioner stated that he understood that by pleading, he was giving up his rights to a trial by jury and continued representation, the right to remain silent, call and cross-examine witnesses, and appeal.  He

---

[1]Neither the judgment nor the indictment(s) are in the record on appeal.

understood that by pleading guilty he would "close the matter forever with regard to [his] guilt or innocence of this offense," that his conviction could increase a future sentence, and that he was pleading outside of his range. He said he had discussed the guilty plea with counsel, was satisfied with his representation, had no questions "about anything at all," and had the amount of time he felt necessary to speak with counsel.

The State offered the following factual basis in support of the guilty plea:

Your Honor, the State would show that on [January 22, 2003] that the Defendant was at the home of Quantel Taylor; that Jeffrey Allen[2] came by and said he needed to make some fast money and that he needed a gun in order to do that; that the three of them went to the home of Chad Bricco; that the Defendant went to the door, got Mr. Bricco; there was some conversation about a gun. Mr. Bricco provided them with a gun and went with them to the home of the Neelys. On the way to the Neelys they discussed the fact that they were going to commit a robbery. When they got to the Neelys they parked down the road. The Defendant and Jeffrey Allen went to the door. Jeffrey Allen had the .40 caliber pistol. The Defendant was following along behind and that's when Mr. Allen shot and killed Leonard Neely and shot and seriously injured Louis Neely.

The Petitioner did not agree with the State's recitation of facts and presented his own. The Petitioner recounted Jeffrey Allen visiting the Petitioner and Quantel Taylor at Taylor's house and asking for a gun, but the Petitioner never mentioned a statement concerning money. He added that he and Taylor told Allen they did not know where a gun was and that the three of them went to the home of Clifton Davis, Taylor's cousin, that Taylor alone entered Davis's home and exited with a shotgun, and that Allen told him to bring the shotgun along. The Petitioner said he, Taylor, and Allen drove to Chad Bricco's home. However, the Petitioner explained that he knocked on Bricco's door because the police had a warrant out for Quantel, and Bricco's mother "is a police." The Petitioner added that he did not go in the house, and Taylor and Allen "was supposed to have bought some drugs from Bricco." The Petitioner said Allen asked Bricco if he had a gun, and Bricco gave Allen a gun. The Petitioner stated he asked the others to take him "back to the house," but they refused and told him he was "stuck with them." He explained that when they arrived at the Neelys', Bricco refused to exit the car because he had so much gold in his mouth, and the Petitioner complied with Allen's request to accompany him to purchase liquor. The Petitioner stated

---

[2]We recognize that the spelling of Allen and Taylor's first names varied in Allen's record on appeal. See Jeffery D. Allen v. State, No. W2011–01666–CCA–R3–PC, 2012 WL 4021128 (Tenn. Crim. App. Sept. 13, 2012).

Allen went into the house while the Petitioner "was on the door step." The Petitioner heard gunshots, saw Allen run out of the house with the gun, and they all ran to the car, but Allen ran back and "shot the house up again." When Allen returned to the car, he threatened to kill the Petitioner or his children and girlfriend if he relayed any of the events. The Petitioner concluded that he "had no parts to do with nothing." He speculated that Allen "tried to put all the blame and stuff on [the Petitioner]" because the Petitioner's girlfriend had previously reported that Allen had committed a burglary, and Allen "got sent to prison for that." The Petitioner's version did not include any conversation about a robbery.

This trial court then engaged in the following colloquy with the Petitioner:

The Court: Mr. Spivey, what it sounds like is that you're saying that you wish to enter this plea because you think it's in your best interest to do that–

[The Petitioner]: Yeah

The Court: –because you think there's a high likelihood that the jury's not going to believe the story you just told; that they're going to find you guilty anyway?

[The Petitioner]: Yes, sir.

The Court: I want to be sure you understand that if I accept your plea I'm going to find you guilty in spite of what you just said. Do you still want me to do that?

[The Petitioner]: To plead?

The Court: Yes, sir.

[The Petitioner]: Yes, sir.

The Court: All right. Mr. Spivey, do you have any question for me at all?

[The Petitioner]: No, sir.

The Court: All right. I'm going to find that your plea is voluntary and knowingly entered on the advice of a competent attorney with

whom you're satisfied. I believe there's a factual basis for the plea, although–I also find that you understand that you're pleading guilty and that you will be found guilty as a result of your plea.

The Petitioner timely filed a pro se petition for post-conviction relief and was appointed counsel who filed an amended petition. At the evidentiary hearing, the Petitioner, trial counsel, and Chief Deputy Jeff Sills of the Crockett County Sheriff's Department testified.

The Petitioner denied committing second degree murder and stated he pleaded guilty to the offense because he "was on medication" and "was misled by [trial counsel]." He said counsel told him he would probably be found guilty at trial and would receive a much greater sentence than if he entered the guilty plea. He said counsel discussed the potential evidence for and against his case and discussed his trial strategy, but he "didn't get to give [counsel] the whole–full details because he didn't never come to see me, so I couldn't talk to him like I wanted to." The Petitioner testified that counsel met with him for the first time "three of four days before trial," though his case had been pending for "four and a half years." The Petitioner said he "did some research on my case myself" and wrote counsel, but "every time [he]'d send him a letter or speak to him he always don't know nothing."

The Petitioner wanted counsel to interview his co-defendant, Quantel Taylor, whom he expected to say that the Petitioner never possessed a weapon during the offense. He also wanted counsel to interview his mother, whom he expected to confirm that the Petitioner did not drive the car involved in the offense or possess the weapon used in the offense. To the Petitioner's knowledge, counsel never spoke with Taylor or his mother. He also wanted counsel to talk to the mother of his child, Marsha Twiddy, whom he expected to confirm that threats were made to take the Petitioner's child away if he did not provide the police with a statement. The Petitioner also said that he was coerced into entering a guilty plea based on these same threats. When questioned whether the Petitioner asked counsel to interview these people, the Petitioner responded that he "couldn't never talk to [counsel]." The Petitioner agreed that he and counsel "attempted to subpoena all of these people today."

The Petitioner asked counsel to visit the crime scene to confirm his belief that his co-defendants could not have seen him enter the house from their vantage point. The Petitioner said counsel filed a motion for discovery but only received his statement and the statements of Bricco and Taylor. He said he told counsel that his co-defendant showed him the statements of Jeffrey Allen and Salisa Woodland, but to his knowledge counsel never obtained their statements. He was not certain whether the State withheld the statement or counsel refused to obtain them. During the Petitioner's testimony, post-conviction counsel

-4-

advised the court that he had "been given free access to the State's file and . . . [had] not been able to find" the Woodland statement the Petitioner had described.

There was some discussion between the court, the State, and post-conviction counsel regarding the Woodland statement. Initially, the post-conviction court attempted to clarify with the Petitioner the existence of such a statement. The Petitioner explained that he had a statement by Woodland in his possession but did not bring it with him to the hearing. He told the court that his co-defendant gave him the statement and that his co-defendant obtained it from his attorney. The State advised the post-conviction court that it had three different statements by Woodland, provided them at the post-conviction hearing, and maintained that they "were in the file and that discovery was made and [denied] that they were not provided [prior to trial]."

On cross-examination, the Petitioner acknowledged that he entered a guilty plea but said he did not recall specific questions, because on the day of his plea he was "on medication." He acknowledged that he made a statement to police, but he said he "made a false statement . . . saying anything so [his] kid wouldn't get taken" away from its mother. He said he could not recall what he said in his statement. He testified that "Penny Curtis" threatened to take his child if he did not give a statement.

He said he did not know Woodland, whom he supposed was Allen's girlfriend, and he did not know whether she could testify to what happened at the victims' house. He admitted that neither his mother nor his child's mother were at the victim's house and that neither could have known what happened there. He admitted he had no knowledge as to whether the State had made the Woodland statement available to counsel.

On redirect examination, the Petitioner agreed that he believed Jeffrey Allen and Salisa Woodland's statements "were the cornerstone of [his] defense" and he did not have them to prepare for trial. He agreed that their "absence" and his "lack of opportunity to discuss trial plans with [counsel] [were] . . . significant factor[s] in [his] decision to plead guilty." He entered the guilty plea because he "felt like [he] didn't have a chance of winning at trial" and "not because [he] felt that the guilty plea was correct or the right thing to do."

Trial counsel "strongly disagree[d]" with the Petitioner's assertion that he only met three times with him and did not spend sufficient time preparing for trial. Counsel testified that he filed a motion for discovery and reviewed and copied all of the State's and Sheriff's Department's files and provided the Petitioner with copies of everything he had. He did not "recall not getting anything that [he] felt was relevant to this case." He met with the Petitioner and asked him to review all of the material and write a statement of what happened. Counsel believed the Petitioner was not honest in his first statement and

-5-

confronted him. He said "[s]everal weeks later I get another statement [from the Petitioner] saying 'I want to tell you the truth about this.'" Counsel said he met with the Petitioner again to hear his second version and still felt it was not honest and told the Petitioner to "tell [him] the absolute truth." Counsel then received a third statement from the Petitioner.

Prior to Jeffrey Allen's trial, counsel spoke with Allen's counsel eight or ten times about the case, and both attorneys met together with the Petitioner for half a day. After Allen's trial, counsel provided the Petitioner with a transcript of Allen's trial and outlined "everything [he] thought the State would come after us about" and discussed that in "detail" with the Petitioner. Counsel said he provided the Petitioner with so much information that it filled two large garbage sacks.

In regard to plea negotiations, counsel obtained an offer of twenty-five years from the State prior to trial. When counsel advised the Petitioner of the offer, the Petitioner told him he needed to talk to his mother and his sister. Counsel advised the Petitioner that he needed to have an answer by that following Monday because they were set for trial. When counsel spoke with the Petitioner the following Monday, the Petitioner had not spoken with his family and they proceeded with the trial. After they selected the jury, the Petitioner then asked counsel if he could enter the guilty plea. Counsel attempted to obtain the twenty-five year offer, but the State refused. The Petitioner then spoke with his mother and sister and entered the guilty plea.

Counsel said he never talked with the Petitioner about what would happen to his children if he did not enter a plea of guilty and was never aware of anyone pressuring the Petitioner in any way regarding his children. Counsel recalled the Petitioner telling him that the night of the crime his girlfriend had "begged him not to go with" the co-defendants, and the Petitioner told counsel: "'The biggest mistake I made I shouldn't have gone,' and that's the only time that [the mother of his child] ever came into play in anything about that."

Counsel said the Petitioner never claimed that his statement to police was coerced. Counsel said he met with Woodland and her attorneys and that she "had no information whatsoever what took place on that trip to Maury City, . . . the discussions that took place, or at the home of the [victims]." Counsel said Ms. Woodland would have testified that Allen told her the Petitioner had shot the victim who died, but her testimony was inadmissable and counsel would "want her as far away from that courtroom as [he] could get her." Counsel was not aware of any information the offices of the District Attorney or Sheriff may have withheld. He said "[t]here was no possibility of an alibi," and Bricco "went into detail about the fact that they discussed robbing these people and that it was going to be necessary to kill [the victim] because he knew Mr. Allen and they had several conversations on the way over there about that." Counsel's trial strategy was to confuse the jury regarding the law of

criminal responsibility and felony murder. Counsel did not observe "the [Petitioner] was under the effects of any sort of medication" or under "any sort of mental duress" on the day he entered the guilty plea.

On cross-examination, counsel believed he could not talk to Taylor, but counsel spoke with Taylor's attorney "numerous times." Counsel denied failing to investigate anything the Petitioner requested. Counsel said he did not visit the house at the crime scene but "reviewed numerous pictures of the scene." Counsel said he reviewed the various statements with the Petitioner, discussed the nature of the witnesses' expected testimonies, and discussed his trial strategy. When asked if he discussed showing that the Petitioner could not have entered the house, counsel replied that their position was that the Petitioner stayed on the porch.

Counsel said "[w]e talked in detail about putting him on the witness stand. I didn't think that was such a good idea, but I don't know how we would convince the jury otherwise without it." Regarding whether he discussed showing that the co-defendants could not have seen the Petitioner enter the house, counsel responded that "the problem is, [the Petitioner] admitted going into the house." Counsel said he would have attacked the co-defendants' testimony on cross-examination, but only Bricco would testify. Counsel said he did not discuss using Woodland's testimony to attack the gun, because counsel did not "know how–whether the gun had blood on it or not would have made any difference about what transpired down the road." Counsel agreed that prior to the Petitioner's guilty plea, he and the Petitioner had no arguments regarding trial preparation.

Chief Deputy Jeff Sills of the Crockett County Sheriff's Department testified that he was the chief investigator in the underlying case. Neither he nor anyone working with him threatened or coerced the Petitioner in order to obtain statements from him. He was not aware of any law enforcement personnel making any reference to the Petitioner's children or what might happen to them if the Petitioner did not cooperate. Chief Deputy Sills testified that with the District Attorney's permission, his office provides "an open case file" and makes copies for any attorney involved in a case. Chief Deputy Sills recalled counsel coming to his office.

He agreed that Woodland was charged with making a false statement, "because of the contradictory nature of the statements she gave." He believed she always knew what transpired but did not provide a truthful answer until the Sheriff's Office had collected its evidence and statements from co-defendants and had determined what occurred. When asked what Woodland would have said regarding the Petitioner, Sills said: "The only thing that I know that Ms. Woodland would be able to say about any of the case was that they was together in Ripley before the incident, they left together and that's all that I know that she would know anything about [the Petitioner]."

-7-

On cross-examination, Chief Deputy Sills said he could not recall whether Woodland said the Petitioner was never in her home, and he explained "Ms. Woodland told so many lies to me that I can't recall . . . what she called a lie and what she called the truth, because I wouldn't believe Ms. Woodland if she said it was snowing in this room right now." On redirect examination, Chief Deputy Sills identified Woodland's statements, which the State entered as exhibit three.

The post-conviction court denied the petition and concluded that the Petitioner had not established deficient performance or prejudice. The Petitioner then filed a timely notice of appeal.

## ANALYSIS

The Petitioner contends that he received ineffective assistance of counsel based on (1) counsel's failure to adequately investigate his case by interviewing the Petitioner's mother, girlfriend, and a co-defendant, (2) counsel's failure to visit the crime scene, and (3) counsel's failure to obtain the statements of Woodland and Allen. The State responds that the post-conviction court credited the testimony of counsel, and the Petitioner has failed to prove his claims of deficient representation or prejudice. We agree with the State.

Post-conviction relief is only warranted when a petitioner establishes that his or her conviction is void or voidable because of an abridgement of a constitutional right. T.C.A. § 40-30-103 (2006). The Tennessee Supreme Court has held:

> A post-conviction court's findings of fact are conclusive on appeal unless the evidence preponderates otherwise. When reviewing factual issues, the appellate court will not re-weigh or re-evaluate the evidence; moreover, factual questions involving the credibility of witnesses or the weight of their testimony are matters for the trial court to resolve. The appellate court's review of a legal issue, or of a mixed question of law or fact such as a claim of ineffective assistance of counsel, is de novo with no presumption of correctness.

Vaughn v. State, 202 S.W.3d 106, 115 (Tenn. 2006) (internal quotation and citations omitted). "The petitioner bears the burden of proving factual allegations in the petition for post-conviction relief by clear and convincing evidence." Id. (citing T.C.A. § 40-30-110(f); Wiley v. State, 183 S.W.3d 317, 325 (Tenn. 2006)). Evidence is considered clear and convincing when there is no serious or substantial doubt about the accuracy of the conclusions drawn from it. Hicks v. State, 983 S.W.2d 240, 245 (Tenn. Crim. App. 1998) (citing Hodges v. S.C. Toof & Co., 833 S.W.2d 896, 901 n.3 (Tenn. 1992)).

<u>Vaughn</u> further repeated well-settled principles applicable to claims of ineffective assistance of counsel:

> The right of a person accused of a crime to representation by counsel is guaranteed by both the Sixth Amendment to the United States Constitution and article I, section 9, of the Tennessee Constitution. Both the United States Supreme Court and this Court have recognized that this right to representation encompasses the right to reasonably effective assistance, that is, within the range of competence demanded of attorneys in criminal cases.

202 S.W.3d at 116 (internal quotations and citations omitted).

In order to prevail on an ineffective assistance of counsel claim, the petitioner must establish that (1) his lawyer's performance was deficient and (2) the deficient performance prejudiced the defense. <u>Id.</u> (citing <u>Strickland v. Washington</u>, 466 U.S. 668, 687 (1984); <u>Baxter v. Rose</u>, 523 S.W.2d 930, 936 (Tenn. 1975)). "[A] failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim. Indeed, a court need not address the components in any particular order or even address both if the [petitioner] makes an insufficient showing of one component." <u>Goad v. State</u>, 938 S.W.2d 363, 370 (Tenn. 1996) (citing <u>Strickland</u>, 466 U.S. at 697).

A petitioner successfully demonstrates deficient performance when the clear and convincing evidence proves that his attorney's conduct fell below "an objective standard of reasonableness under prevailing professional norms." <u>Id.</u> at 369 (citing <u>Strickland</u>, 466 U.S. at 688; <u>Baxter</u>, 523 S.W.2d at 936). Prejudice arising therefrom is demonstrated once the petitioner establishes "'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" <u>Id.</u> at 370 (quoting <u>Strickland</u>, 466 U.S. at 694). In order to satisfy the "prejudice" requirement in the context of a guilty plea, a petitioner "must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." <u>Hill v. Lockhart</u>, 474 U.S. 52, 59 (1985); <u>see</u> <u>Serrano v. State</u>, 133 S.W.3d 599, 605 (Tenn. 2004).

In denying the petition, the post-conviction court stated:

> I find that [counsel's] testimony was both believable and convincing. I find that [the Petitioner's] testimony was neither of those things. I find that [counsel] met and exceeded all standards of competency for criminal defense attorneys in West

Tennessee and Tennessee and any other state as well in preparing for a criminal trial. I find that he fully apprised himself of both the facts of this case and the law dealing with it; that he explored all possible avenues of strategy and defenses. Had the Defendant not decided to plead guilty after the jury was selected, I'm convinced that [counsel] would have represented him fully and effectively and efficiently at the trial.

I find no evidence of any sort of coercion of the [Petitioner] regarding either his children or anything else that might have influenced his decision to plead guilty other than his own informed self interest.

Upon our review, we conclude that the record fully supports the findings of the post-conviction court. First, the Petitioner asserts counsel failed to interview his mother, the mother of his child, and co-defendant Taylor. However, trial counsel testified that Taylor was represented by counsel, whom he met with numerous times. Counsel additionally testified that the Petitioner mentioned his child's mother only in reference to her attempt to convince the Petitioner not to accompany the co-defendant's on the night of the offense. Significantly, the Petitioner admitted that neither his mother nor the mother of his child were at the scene of the crime. Secondly, the Petitioner asserts he asked counsel to visit the victims' house and the crime scene for the purpose of discrediting his co-defendant's claim that he entered the house. Counsel admitted that he did not visit this house but testified that he reviewed numerous pictures of the crime scene and saw no need to visit the house. Counsel explained that visiting the crime scene to prove that the co-defendants could not have seen the Petitioner enter the house was not necessary, because the Petitioner had admitted that he entered the house.

Next, the Petitioner asserts that counsel failed to obtain certain statements from Woodland and Allen. The Petitioner asserts he read a statement from Woodland in which she said that she never saw the Petitioner at her house, apparently where the discussions of the robbery occurred. Counsel testified that he obtained every document the State and Sheriff's office had, provided the Petitioner with a copy of everything he had, and reviewed the statements with the Petitioner. Counsel testified he was never aware of anything in existence that he did not receive. He said he obtained the Woodland statements and provided them to the Petitioner. Counsel did not see anything in the Woodland statements that would aid the Petitioner and wanted to keep Woodland as far away from the courthouse as possible. Chief Deputy Sills testified that due to her inconsistent statements, Woodland had been charged with making false statements and that she lied to him so much he could not believe anything she said. He testified that Woodland was not at the crime scene and could only

provide information she received from Allen. Though the State entered the Woodland statements into evidence at the evidentiary hearing, the Petitioner did not specify any exculpatory information within the statements. Finally, the parties at the hearing conceded that the Woodland statement was not relevant to the Petitioner's case.

To support each of these claims, the Petitioner relies solely upon his testimony, which the post-conviction court discredited. As this court has repeatedly stated, we do not reweigh the court's credibility determinations. The Petitioner concedes that many of his arguments "hinged on the relative credibility" of counsel and the Petitioner and the court "credited the testimony of [counsel] and discredited the testimony of [the Petitioner]." Accordingly, we conclude that the Petitioner has failed to demonstrate deficient performance or prejudice. He is not entitled to relief.

**II. Involuntary Guilty Plea**. The Petitioner asserts that his guilty plea was "neither knowing nor voluntary due to the ineffective assistance he received from [counsel]," and he specifically cites counsel's alleged failure to adequately prepare for trial and the threats from the Sheriff Department to remove his child from its mother. The Petitioner concedes that counsel "testified that he was well-prepared, and had thoroughly discussed the case with [the Petitioner], and that never, during the course of many discussions, had [the Petitioner] intimated that any pressure had been applied by the Sheriff's department relative to his child and its mother." Counsel also testified that the Petitioner mentioned his child's mother only once, and counsel and Chief Deputy Sills testified that they never heard any coercion, threats, or conversations regarding the Petitioner's child.

Our review of the record shows that the trial court properly followed the directives of Rule 11 of the Tennessee Rules of Criminal Procedure and found the Petitioner entered his guilty plea voluntarily and knowingly. This Court has stated, "[a] petitioner's solemn declaration in open court that his or her plea is knowing and voluntary creates a formidable barrier in any subsequent collateral proceeding because these declarations 'carry a strong presumption of verity.'" Sterling Lamar Cooper v. State, No. E2012–00383–CCA–R3–PC, 2013 WL 326209 (Tenn. Crim. App. Jan. 29, 2013) (quoting Blackledge v. Allison, 431 U.S. 63, 74 (1977)). The post-conviction court determined that "there [was] no evidence of any sort of coercion of the [Petitioner] regarding either his children or anything else that might have influenced his decision to plead guilty . . . [and] nothing whatsoever in this record that indicates that the [Petitioner's] plea was coerced." The record supports the post-conviction court's findings that the Petitioner was not coerced and that his guilty plea was voluntarily and knowingly entered. Accordingly, the Petitioner is not entitled to relief.

-11-

**Brady Violation**.[3]  In the alternative, the Petitioner asserts that the State suppressed certain statements from Woodland and Allen.  He concedes that counsel testified that he obtained these statements and that Chief Deputy Sills testified that he provided counsel with copies of the statements.  He further concedes that the court found counsel's testimony to be both credible and convincing and found the Petitioner's testimony to be neither.  Though the Petitioner acknowledges the court "presumably" discredited his testimony with respect to the Brady allegation, he asserts that because the court did not address this argument specifically, this Court should remand the case "for entry of findings of fact and conclusions of law as to the question of the alleged *Brady* violation."  The State responds that the Petitioner has not shown that these witness statements were exculpatory and regardless, counsel testified he obtained the statements and discussed discovery with the Petitioner.

In regard to this issue, we fail to see and the Petitioner has failed to explain the relevance or the exculpatory nature of the statements.  At the evidentiary hearing, post-conviction counsel admitted that the Woodland and Allen statements the Petitioner referred to were not relevant and stated "[j]ust that [the Petitioner] felt that they were."  Trial counsel additionally testified that he received the statements and shared them with the Petitioner prior to trial.  Accordingly, we conclude that the Petitioner is not entitled to relief on this issue.

## CONCLUSION

After a thorough review of the record, we affirm the judgment of the post-conviction court.

_____
CAMILLE R. McMULLEN, JUDGE

---

[3]  The Due Process Clause of the Fourteenth Amendment to the United States Constitution and the "Law of the Land" Clause of Article I, section 8 of the Tennessee Constitution afford all criminal defendants the right to a fair trial.  The United States Supreme Court in  Brady v. Maryland, 373 U.S. 83, 87, 83 S. Ct. 1194, 1196-97 (1963), held that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or punishment, irrespective of good faith or bad faith of the prosecution."